### Ex parte SHAHID.

(District Court, E. D. South Carolina. June 24, 1913.)

ALIENS (§ 62*)—CITIZENSHIP—RIGHT TO ADMISSION—PERSONAL DISQUALIFICATION.

> Where a Syrian, on application for admission to citizenship, testified that he came to the United States 11 years before and was a Christian, but could neither read nor write English, and spoke and understood English very imperfectly, did not understand any questions relating to the manner or methods of American government, or the responsibilities of a citizen, and could not be made to understand in English the purport of questions whether he was a polygamist or a disbeliever in organized government, both of which he answered in the affirmative, desiring citizenship only that he might bring his wife and children into the country, his personal disqualifications were such as to disentitle him to admission, without reference to whether he was a free white person within the Naturalization Act (Act Cong. March 26, 1790, c. 3, 1 Stat. 103), as amended by Act July 14, 1870, c. 254, 16 Stat. 254.

> [Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 123–125; Dec. Dig. § 62.*]

Petition by Faras Shahid for naturalization. Denied.

SMITH, District Judge. This is an application for naturalization. The applicant has performed all the necessary formalities, and the matter now comes up first upon his right to naturalization, and next whether, conceding that he belongs to the class of persons entitled to the benefit of naturalization, he is a fit subject to be naturalized.

According to his statement he is now 59 years of age, and was born at Zahle, in Asia Minor, in Syria, and came to this country about 11 years ago, and is a Christian. He writes his name in Arabic, cannot read or write English, and speaks and understands English very imperfectly, and does not understand any questions relating to the manner and method of government in America, or of the responsibilities of a citizen. His answers to the questions whether he is a polygamist or a disbeliever in organized government were in the affirmative, and he could not be made to understand in English the purport of the

questions asked. His wife and most of his children are still living in Syria, and he desires to be naturalized so as to bring them over to this country. In color, he is about that of walnut, or somewhat darker than is the usual mulatto of one-half mixed blood between the white and the negro races.

The first question that comes up for consideration is whether a Syrian of Asiatic birth and descent is entitled under the act of Congress to be admitted a citizen of the United States. This depends upon the construction of the provisions of the law, and practically upon the construction of the following clause, which limits the classes entitled to the benefit of the naturalization statute, viz.:

"The provisions of this title shall apply to aliens being free, white persons, and to aliens of African nativity and to persons of African descent."

The phrase "free white persons" was used in the first naturalization statute approved March 26, 1790 (1 Stat. 103, c. 3), and the phrase "aliens of African nativity and to persons of African descent" was incorporated in the amendatory statute approved July 14, 1870 (16 Stat. 254, c. 254). As so phrased, the language of the statute is about as open to many constructions as it possibly could be.

Who is a free white person? And who is a person of African nativity or of African descent? It has been decided that the Chinese, Japanese, Malays, and American Indians do not belong to the white race and are therefore excluded. Furthermore, by express additional statutory provision the Chinese are expressly excluded. This, however, leaves open the question: Suppose one of these people had been born in Africa, would the children of Chinese parents, for instance, or Japanese parents, because born in Africa, be of African nativity?

Next, what is the meaning of African descent? The Chinaman is not entitled to be admitted to citizenship, but would a half-breed, the child of a negro and a Chinese, be entitled to admission because by his mother's or his father's side he was of African descent? Then what is the limitation of African descent? For how many generations would that continue? If the son of an African man by a Chinese woman is entitled to admission by reason of African descent, would the great-great-grandson of an African, although one whose immediate ancestors were Chinese, and who had lived in China, be entitled to admission by reason of the infinitesimal portion of negro blood in him? Then, what is white? What degree of colorization, if it be referred to color, constitutes a white person as against a colored person, and is the court to take the responsibility by ocular inspection of determining the shades of different colorization where the dividing line comes between white and colored.

The statute as it stands is most uncertain, ambiguous, and difficult both of construction and application, and all that the court can do is to construe it under the test and control of the legal rules for the construction of statutes. There have been a number of decisions in which the question has been treated, and the conclusions arrived at in them are as unsatisfactory as they are varying, viz.: In re Ah Yup, 5 Sawy. 155, Fed. Cas. No. 104, excluding Mongolians; In re Camille, 6 Fed. 256, excluding a half-breed Indian and white; In re Gee Hop (D. C.)

71 Fed. 274, excluding a Chinese; In re Rodriguez (D. C.) 81 Fed. 337, admitting a Mexican; In re Kumagui (D. C.) 163 Fed. 922, excluding a Japanese; In re Knight (D. C.) 171 Fed. 299, excluding a half-breed Mongolian and white; In re Najour (C. C.) 174 Fed. 735, admitting a Syrian; In re Halladjian (C. C.) 174 Fed. 834, admitting an Armenian; In re Mudarri (C. C.) 176 Fed. 465, admitting a Syrian; Bessho v. U. S., 178 Fed. 245, 101 C. C. A. 605, excluding a Japanese; In re Ellis (D. C.) 179 Fed. 1002, admitting a Maronite; In re Balsara (C. C.) 180 Fed. 294, admitting a Parsee.

After considering them all in an attempt to evolve, if possible, some definite rule for judicial decision, the conclusion that this court has arrived at is as follows: That the meaning of free white persons is to be such as would naturally have been given to it when used in the first naturalization act of 1790. Under such interpretation it would mean by the term "free white persons" all persons belonging to the European races, then commonly counted as white, and their descendants. It would not mean a "Caucasian" race; a term generally employed only after the date of the statute and in a most loose and indefinite way.

The term "Caucasian" obtained much currency in the pro and anti slavery discussions between 1830 and 1860, but later and more discriminating examination and analysis has shown its entire inapplicability as denoting the families or stocks inhabiting Europe and speaking either the so-called Aryan or Semitic languages. Nor would "free white persons" mean an "Aryan" race, a word of much later coinage, and practically unknown to common usage in 1790, and one still more indefinite than Caucasian, and which would exclude all Semitics, viz., Jews and Arabians, and also all Europeans, such as Magyars, Finns, and Basques, not included in the Aryan family. It would not mean "Indo-European" races, as sometimes ethnologically at the present day defined as including the present mixed Indo-European, Hindu, Malay, and Dravidian inhabitants of East India and Ceylon; nor the mixed Indo-European, Dravidian, Semitic, and Mongolian peoples who inhabit Persia. It would mean such persons as were in 1790 known as white Europeans, with their descendants, including as their descendants their descendants in other countries to which they have emigrated, such as the descendants of the English in Africa or Australia, or of the French and Germans and Russians in other countries.

This may not, ethnologically or physiologically speaking, be a very clear and logical construction. It includes all European Jews who are of Semitic descent, more or less intermixed with the peoples of European habitancy, viz., with peoples of Celtic, Scandinavian, Teutonic, Iberian, Latin, Greek, and Slavic descent. It includes Magyars, Lapps, and Finns, who are of Ugric stock, and the Basques and Albanians. It includes the mixed Latin, Celtic-Iberian, and Moorish inhabitants of Spain and Portugal, the mixed Greek, Latin, Phœnician, and North African inhabitants of Sicily, and the mixed Slav and Tartar inhabitants of South Russia. It includes peoples containing many of them blood of very mixed races, but the governing or controlling element or strain in all is supposed to be that of a fair-complexioned people

of European descent. In 1790 the distinctions of race were not so well known or carefully drawn as they are to-day. At that date all Europeans were commonly classed as the white race, and the term "white" person in the statute then enacted must be construed accordingly. To hold that a pure-blooded Chinaman, because born in England or France, was included within the term, would be as far-fetched as to hold that a pure-blooded Englishman, Irishman, or German born in China was excluded.

The modern Bengalee or Parsee or Persian may be partly of Indo-European descent. The ancient Zend and Vedic writings apparently emanate from a fair-complexioned, light-haired, if not blue-eyed people. The speakers of Sanscrit, who conquered Hindoostan, or the speakers of ancient Zend, who conquered Persia, were probably within that category. But in India the conqueror seems to have been soon swallowed up in an enormously preponderant brown or black people of different race, and in Persia the same result followed in a degree afterwards accentuated by the terrible Mongolian or Tartar invasions, which destroyed whole communities, replacing them by pure Mongolians. In most Asiatic countries the governing or controlling element or strain is apparently that of a dark-colored people, not of European descent. The Russian settlers in Siberia, and the Greek and Jewish settlements in Asia Minor, and the Armenians on the Asiatic side of the Caucasus, would constitute exceptions.

To say that a very dark brown, almost black, inhabitant of India is entitled to rank as a white person, because of a possible or hypothetical infusion of white blood 30 or 40 centuries old, and to exclude a Chinese or Japanese, whose parent on one side was white, and who thus possesses manifestly at least one-half European blood, would seem highly inconsistent. If the matter were placed, as some decisions would indicate, on intellectual status and achievement, then the Japanese and certain of the Chinese would be clearly entitled to stand with many of the so-called white nations and with the Parsee, the Brahmin, and the Persian, and far above the negro races.

The law as enacted by Congress gives no place for the consideration of intellectual or moral qualifications or past achievements in a nation or people. It says that the privileges of citizenship of this country may be extended to "free white persons" and to persons of "African nativity" and "African descent." It may be that a highly educated and cultivated Japanese or Chinese or Malay or Siamese is better calculated to make a useful and desirable citizen than a savage from the Guinea coast, but it is not for the courts to give effect to such reasoning. It may also be that the statute as it stands is ambiguous and defective and most difficult of application. All such questions are for the lawmaking department, and the courts can only apply the law as it finds it on the statute book.

In the face of all these difficulties it is safest to follow the reasonable construction of the statute as it would appear to have been intended at the time of its passage, and understand it as restricting the words "free white persons" to mean persons as then understood to be of European habitancy or descent. By persons of African nativity or

African descent presumably the statute means the negro races of Africa or their descendants by intermixture with the races before defined as being the races constituting free white persons. The negro races of Africa presumably referred to are those races from which the emancipated slaves in the United States (who were made citizens by the 14th amendment to the United States Constitution) descend.

This construction of the statute would exclude from naturalization all inhabitants of Asia, Australia, the South Seas, the Malaysian Islands and territories, and of South America, who are not of European descent, or of mixed European and African descent. Under this definition the inhabitants of Syria would be excluded. What is the race or color of the modern inhabitant of Syria it is impossible to say. No geographical area of the world has been more mixed since history began. Originally, possibly of Hittite or non-Semitic races, for a time at least under Egyptian domination, then apparently taken possession of largely, and possibly almost exclusively, by the Semitic peoples, then overlaid with immigration from European races, then again followed by another Semitic conquest in the shape of the Arabian Mahometan eruption, then again overlaid by the Mongolian and Turkish conquests, and through it all with an infusion of blood by slaves brought from any accessible part of the world.

One Syrian may be of pure or almost pure Jewish, Turkish, or Greek blood, and another the pure-blooded descendant of an Egyptian, an Abyssinian, or a Sudanese. How is the court to decide? It would be most unfortunate if the matter were to be left to the conclusions of a judge based on ocular inspection. The geographical interpretation that "free white persons" mean persons of European habitancy and descent is at least capable of uniform application, and gives to the statute a construction that avoids the uncertainties of shades of color and invidious discriminations as to the race of individuals. Under the construction of the statute above fixed, a modern Syrian of Asiatic birth and descent would not be entitled under the statute of Congress to be naturalized as a citizen of the United States.

The argument that such a construction would exclude persons coming from the very cradle of the Jewish and Christian religions, as professed by the nations of Europe whose descendants form the great bulk of the citizens of the United States, is unworthy of consideration. Such arguments are of the emotional ad captandum order, that have no place in the judicial interpretation of a statute. If the people of the United States, through their representatives in Congress, see fit to exclude by law from citizenship the most worthy and spiritual inhabitants of the globe, it is not for the courts by judicial legislation to gainsay that law, and substitute for it what in their opinion may be more appropriate and reasonable legislation.

In the present case the applicant is not one the admission of whom to citizenship is likely to be for the benefit of the country and in favor of whom the court should exercise the power of discretion given under the statute, and in view of the great uncertainties resulting from the language of the statute and the unsatisfactory reasoning of most of the decisions, the court, without determining the general question

of admissibility, will rest its conclusion that the present applicant should not be admitted upon his own personal disqualifications.

Ordered, that the application of the applicant be refused.