---

Ex parte DOW.

(District Court, E. D. South Carolina. February 18, 1914.)

ALIENS (§ 61*)—NATURALIZATION—PERSONS ENTITLED—"FREE WHITE PERSON."
    The words "free white person," as used in Naturalization Act Cong. March 26, 1790, c. 3, 1 Stat. 103, as amended by Act July 14, 1870, c. 254, 16 Stat. 254, do not mean a person white in color, nor do the words designate racial distinction meaning Caucasian or Indo-European, but are to be construed rather as a geographical term referring to the peoples who were commonly known in the United States as those inhabiting Europe and whose descendants, at the time of the passage of the act of 1790, formed the inhabitants of the United States, excluding Africans, and hence did not include a native of Syria.

    [Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 119–122; Dec. Dig. § 61.*]

Application by George Dow for naturalization. Denied. Order affirmed on rehearing in 213 Fed. ——.

SMITH, District Judge. This is an application for naturalization. The applicant is a native of a place called by him Batroun, in Syria in Asia. He has performed all the necessary formalities and would apparently from his intelligence and degree of information of a general character be entitled to naturalization. In color he is darker than the

usual person of white European descent, and of that tinged or sallow appearance which usually accompanies persons of descent other than purely European. His mental and other faculties, his information and general knowledge, and his residence in this country would entitle him, as before said, to naturalization, if he is entitled to naturalization under the terms of the act of Congress in that behalf. This matter was discussed by this court in the case of Ex parte Shahid (D. C.) 205 Fed. 812. The personal objections to the admission of Shahid and upon which his rejection was based in that decision do not apply to the present applicant. If rejected he can only be so upon the ground that under the statute by reason of his nativity and descent he is not entitled to be admitted as a citizen of this country, and the point therefore comes up squarely upon the question whether a Syrian of Asiatic birth and descent is entitled to be admitted a citizen. As stated in the case of Ex parte Shahid, this depends upon the construction of the clause in the statute which limits the classes entitled to naturalization, as follows:

"The provisions of this title shall apply to aliens being free white persons, and to aliens of African nativity and to persons of African descent."

The applicant's claim to admission is not upon the ground that he is either an alien of African nativity or a person of African descent. This part of the clause being excluded, his application depends upon whether he is a free white person. Is a Syrian of Asiatic birth a free white person within the meaning of the statute approved March 26, 1790? There have been discussions as to the construction to be given these words, which have treated it somewhat in three aspects:

First. Do the words "free white persons" mean persons white in color? Is the definition to be determined by the colorization of the applicant to be ascertained by ocular inspection by the court? This definition, as determinable in the shape of the definition of color, has been by the great weight of authority under the decisions of the courts in this country rejected, and it has been held that the right of the applicant is not to be determined by the question whether or not upon ocular inspection he may in the opinion of the judge be actually white in color.

Second. The next question is whether the definition is racial; that is, whether the words "white persons" are a racial designation. And that "white" is to be interpreted as meaning Caucasian, so called, or Indo-European. If racial, is any one entitled to be admitted who belongs to a nation that speaks one of the languages spoken by the peoples heretofore denominated Caucasian, whether or not his color be the very reverse of white. This would mean the admission of all the mixed Asiatic races which speak a tongue the descendant of one of the so-called Indo-European tongues, whether that tongue may have been forced upon them or inherited by a very mixed transmission in point of race. The dark colored, in fact, almost black, inhabitants of Ceylon, speak the Sinhalese language, which is one of the dialects of that branch of the ancient Indo-European language known as Sanscrit, and the dark colored inhabitants of the Persian Gulf or Persian Coast speak a tongue which appears to be the descendant of the ancient Iranian.

If racial determination or definition is to be given to the expression as limiting it to the Caucasian races, and the Caucasian race is to be determined philologically by the tongue spoken as Indo-European, then there are a number of European peoples who would be excluded, such as the Magyars, the Finns, the Turks, the Basques, and the Lapps.

The language spoken, although a strong evidence as to the race of the speaker (and apparently the stronger the earlier in the period of the world's history is the point of ascertainment), yet, as is known by modern examples, is not by any means conclusive. The negro occupants of the French West Indies speak a Latin tongue, and the negro occupants of the English West Indies a Saxon tongue, although racially not belonging to either race. History informs us that in many well-known instances the language of the conqueror has been imposed upon the conquered, and conversely the language of the conquered has been accepted by the conqueror, although of a wholly different race. In the case of the Hindu and the modern Persian by reason of the fact that their present speech is a descendant of an Indo-European tongue, they have been classed as "Aryan" or "Caucasian" brothers in the face of the proof historical and ethnological that they represent instances where the conqueror imposed his language upon a subject race into the mass of which eventually the smaller numerical body of conquerors has been submerged.

The modern Egyptian to-day speaks an Arabian language that he has only acquired from his conquerors in comparatively recent times.

To speak of the Asiatic inhabitants of Persia or India as "Aryan" or "Caucasian" is almost as great a contradiction as to call a negro inhabitant of South Africa a Saxon because he speaks English, or an Indian inhabitant of Peru or Mexico a Latin because he speaks Spanish. While there has been a great deal of difference and confusion about this point, owing in great measure to the apparent lack of conception of exactly what is meant by a Caucasian or Indo-European race, the general inclination would be to consider the definition of Caucasian as what is supposed to be meant by white. This, however, is very loose and indefinite, for the meaning of Caucasian as at one time prevalent has been now practically exploded. The meaning of Caucasian as so applied did not exist, generally speaking, at the time of the passage of the act of March 26, 1790, although it did afterwards obtain wide currency during the slavery and antislavery discussions which preceded the year 1860. Such a racial definition is very difficult, to say the least, of enforcement; for, as I have stated above, it is based upon a construction which would exclude some people generally known and termed as white, and include those who have been always considered as not forming a part of the white race. This definition might be termed a racial definition as against the first, which has been referred to as the definition of color.

Third. The next definition may be termed a geographical one. Does the word "white" in the statute refer to the peoples who were then commonly known in this country as the peoples inhabiting Europe and whose descendants at the time of the passage of the act of 1790 formed the inhabitants of the United States, excluding from such considera-

tion the African descendants who were then slaves. If we give to the term "white" this geographical definition, that it means European, that "white" was used in the sense of European, the statute becomes one judicially speaking plain, understandable by the multitude as well as by the learned, and not difficult of enforcement. The words "free white persons" would then mean all the fair complexioned people of European habitancy and descent commonly termed in 1790 the white races. That would appear to be what was intended by the terms of the act of 1790. It intended under the reasoning set out in Ex parte Shahid, supra, to admit to citizenship in this country the people generally known as white; that is to say, the inhabitants of Europe and their descendants. This would include many people who would not come within the definition of Caucasian or Indo-European, but nevertheless it was the general understanding that the inhabitants of Europe who were the parents of the inhabitants of the United States were white people. In the opinion of the court this is the correct and proper construction of the statute. The meaning of free white persons in the statute is free persons of European habitancy or descent, and such, and such alone, are entitled to be admitted to naturalization under the terms of that clause of the statute. This exclusion is no reflection upon the applicant, intellectual, moral, or racial. It simply means that the lawmaking power has not seen fit to admit to citizenship, under the clause mentioned, persons other than of European habitancy or descent. The court has no hesitation in saying that the applicant now before it would apparently be qualified to form a more desirable citizen than very many of those we now have as citizens, whether by birth or naturalization. No race in modern times has shown a higher mentality than the Japanese. To refuse naturalization to an educated Japanese Christian clergyman and accord it to a veneered savage of African descent from the banks of the Congo would appear as illogical as possible, yet the courts of the United States have held the former inadmissible and the statute accords admission to the latter. This refusal is no reflection upon the excluded Japanese. The statute presents what may appear to be the startling discrimination that it forbids the privilege of citizenship to a Chinese or a Japanese descendant of two historic races that have accomplished so much in the constructive intellectual work of the world, and extends the privilege to a member of a savage negro tribe.

The admission of a foreigner to the privilege of citizenship in a country is wholly a matter for the people of that country. They may be as capricious and unreasonable as they see fit about it. It is a voluntary donation to be extended or denied according to the whims of the donor if he shall see fit to allow his action to be controlled by caprice or whim. He has certainly a right to be controlled by his ideas of prudent or wise policy towards himself in making the donation. The present applicant may be a free white person. So also may be an individual Japanese or South Sea Islander. The court does not undertake to say what races of mankind in matter of complexion should or should not be classed as white. There is a vast range in shades of white between the Northern Scandinavian and the Southern Portu-

guese. The only point decided is that the applicant is not that particular free white person to whom the act of Congress has donated the privilege of citizenship in this country with its accompanying duties and responsibilities.

In donating this privilege the people of the United States have seen fit under the description of free white persons to restrict the privilege as extended to such foreigners to persons of European habitancy and European descent. The applicant being an Asiatic does not come within the terms of the statute, and, whatever may be his other qualifications, Congress has not seen fit to endow him with the right to be admitted a citizen of the country.

For the reasons set out in this decree and the decree in Ex parte Shahid, supra, the application of the petitioner is refused.