---

### In re DOW.

(District Court, E. D. South Carolina. April 15, 1914.)

ALIENS (§ 61*)—PERSONS CAPABLE OF NATURALIZATION—"WHITE PERSONS"—SYRIANS.

The meaning of the words "white persons," as used in Rev. St. § 2169, as amended in 1875 (U. S. Comp. St. 1901, p. 1333), authorizing the naturalization of aliens "being free white persons," cannot be determined on any ground of complexion or race, but in view of the conditions existing in 1790, when they were first used in the naturalization statute, must be

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

limited to persons of European nativity or descent. As so construed, a Syrian is not entitled to naturalization.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 119–122; Dec. Dig. § 61.*

For other definitions, see Words and Phrases, vol. 8, pp. 7446, 7447.]

On rehearing. Application for naturalization denied.

For former opinion, see 211 Fed. 486.

T. Moultrie Mordecai, of Charleston, S. C., for applicant and the Syrian American Ass'ns.

SMITH, District Judge. At the instance of the applicant and other Syrians interested, a rehearing was granted in this case, which has been had, and argument has been heard on behalf of the applicant himself as well as from counsel appearing on behalf of the Syrian American Associations of the country.

Deep feeling has been manifested on the part of the Syrian immigrants because of what has been termed by them the humiliation inflicted upon, and mortification suffered by, Syrians in America by the previous decree in this matter which they construe as deciding that they do not (as they term it) belong to the "white race."

In the first place, such was not the decision of this court. The decision of the court in this case was that a modern Syrian was an Asiatic, and was thus not included in the term "white persons" as contained in section 2169 of the U. S. Revised Statutes as amended in 1875, and first used in the Statute of 1790. In the second place, there was no justifiable reason for either humiliation or mortification. The grant of the privilege of citizenship is purely discretionary with the people of the country. It is entirely distinct from the admitting to entry and residence. It carries with it great powers of good and evil in the exercise of the ballot and great responsibilities in the duties of the jury box. The immigrant such as the present applicant is freely admitted here. He comes from a land where he deems himself oppressed, to a free country where he is allowed to enjoy life, liberty, and the pursuit of happiness in as full democratic measure as the citizens of the country themselves. That he should further be allowed to take part in the government as a voter and exercise the weighty judicial powers of a juror is an entirely different matter. That this should be refused to him is no real ground for humiliation. Congress has admittedly seen fit to exclude from that privilege Chinese, Japanese, Malays, Mongols generally, and American Indians. It is no more a humiliation for a Syrian to be excluded from a privilege (not a right) than it is to an educated and cultivated person from China, Japan, or the Malay Peninsula.

The true ground of this supposed humiliation is that the applicant and his associates conceive the refusal of this privilege to mean that they do not belong to a white race, but to a colored and what they consider an inferior race. The inconsistency of this attitude is apparent. The statute does admit to citizenship the very race they term inferior. It admits persons of "African nativity and African descent."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

So that if the applicant and his associates did belong to the race they so deem inferior, they could be admitted to that very privilege the refusal of which so humiliates them. The admitting a black African and excluding a brown Asiatic may be arbitrary and unreasonable, but it cannot be said to be humiliating, and at any rate it is certainly a matter wholly for Congress in its pure discretion.

It may be that in 1870 when Congress enlarged the provisions of the statute as to aliens who could be naturalized by extending the privilege to persons of African nativity, and African descent, it considered that the immigration of that character would be inconsiderable, whereas if it opened the privilege to persons of Asiatic nativity and Asiatic descent it might be overwhelming; but that conclusion cannot be said to involve any humiliation to the Asiatic.

The previous decision in this case was that the term "white persons," as used in the statute, meant persons of European nativity or European descent. The applicant was excluded because he was an Asiatic and not an European. Whether he belonged to a white race or not was not decided as not pertinent to the issue.

The applicant and his associates now seek to have that decision reconsidered and reversed upon the following grounds:

(1) That the term "white persons" in the statute means persons of the "Caucasian race," and not persons white in color.

(2) That he is a Semite or a member of one of the Semitic nations.

(3) That the Semitic nations are all members of the "Caucasian" or white race.

(4) That the matter has been settled in their favor as the European Jews have been admitted without question since the passage of the statute and that the Jews are one of the Semitic peoples.

(5) That the history and position of the Syrians, their connection through all time with the peoples to whom the Jewish and Christian peoples owe their religion, make it inconceivable that the statute could have intended to exclude them.

The judge upon an application for naturalization is called upon to pass upon the question whether the applicant is entitled under the terms of the statute. The present applicant denies that he is a person of African nativity or African descent. He asserts that he is a person of Asiatic nativity and of Asiatic descent. The question is then presented to the court whether such an Asiatic is a white person as intended by the statute.

At first reading the term "white" denotes color. Construed literally the statute might be interpreted to mean such a person as under the ocular inspection of the court seemed to be white in color. What standard of "white" is the judge to adopt? The clear white of a Scandinavian, or the swarthy olive or brown of a person from the south of Portugal?

Disease and other causes sometimes cloud and darken the fairest skin and lighten the darkest. It is manifest that it would be absolutely impossible for a judge to determine whether an applicant is a white person by ocular inspection. Again, out of the multitude of

judges in this country, how could there be any uniform rule under such a test? No two judges would agree upon the same standard or grade of colorization. The spectacle would be presented of one judge excluding and another admitting persons of the same grade of complexion. For these and other similar reasons the strict "color test" as the test under the statute has been repudiated by the courts of the country.

As a substitute for this test, some courts have followed in a way what may be termed the test of race. In other words, the words "white persons" have been construed as meaning persons of the "white race," and it has been held that if a person belonged to a so-called white race he was entitled to naturalization, no matter what his complexion. What is the white race? Or what was known as the white race in 1790? Most of the courts in this country that have attempted to deal with the question have referred to the white race as the "Caucasian" race, and said that a member of the Caucasian race was entitled to be naturalized without regard to complexion. Very few agree as to what peoples are members of the Caucasian race, and the term "Caucasian". received its wide currency in the United States largely from the fact that for 70 years after the statute of 1790 a large number of persons of a black complexioned race were held as slaves, and one of the justifications advanced was that they did not belong to the superior race which was styled Caucasian supposing that term referred to white. The term "Caucasian" in its application to race originated with one Blumenbach, who in 1781 published in German a work attempting to classify the races of mankind in which he classed as "Caucasian" the inhabitants of Europe and of the Caucasus and of. Asia Minor, Western Asia including Syria, and of Northern Africa.

Blumenbach determined his classification neither by complexion nor by philological or scientific ethnological principles as now understood. He put together as one race in his own words "altogether the inhabitants of the world known by the ancient Grecians and Romans." The peoples possessing according to Blumenbach "according to European ideas of beauty the form of the face and skull most perfect." For the designation "Caucasian" he was indebted to the following circumstances:

"Of all the odd myths that have arisen in the scientific world, the 'Caucasian mystery' invented quite innocently by Blumenbach is the oldest. A Georgian woman's skull was the handsomest in his collection. Hence it became his model exemplar of human skulls, from which all others might be regarded as derivations; and out of this, by some strange intellectual hocus-pocus, grew up the notion that the Caucasian man is the prototypic 'Adamic' man and his country the primitive center of our kind." Huxley, Methods & Results of Ethnology (Ed. of 1894).

Or as said by Latham:

"Blumenbach had a solitary Georgian skull and that skull was the finest in his collection, that of a Greek being the next. Hence it was taken as the type of the skull of the more organized division of our species. More than this, it gave its name to the type and introduced the term Caucasian. Never has a single head done more harm to science than was done in the way of posthumous mischief by this well-shaped head of a female from Georgia." Latham, "The Nationalities of Europe."

The scientific conclusion of scholars of the present day is that the inhabitants of the Caucasus are to be classed with the Mongols, and not with the Europeans, so that Blumenbach derived his term from a skull more likely to have been Mongolian than European, or it may be the skull of some traveler or captive in the Caucasus.

"The ill chosen name of Caucasian invented by Blumenbach in allusion to a South Caucasian skull of especially typical proportions, and applied by him to the so-called white races, is still current; it brings into one race peoples such as the Arabs and Swedes, although these are scarcely less different than the Americans and Malays who are set down as two distinct races." E. B. Tylor in article on Anthropology, Encyclo. Brit. (11th Ed.).

Subsequent to 1781, and Blumenbach's ill-chosen classification, came the great development of philological study initiated by the acquisition of the Sanscrit and Zendic or Iranian languages. The discovery that Sanscrit, the ancient language of Northern India, and Zend or Iranian, the ancient language of Northern Persia held affinities of a definite character with Gothic, Celtic, Slavonic, Latin, and Greek, stimulated the scientific study of philology, and its inferences carried to an extreme, persuaded many to determine racial by language affinities, wholly oblivious of the fact that there are many instances where a language of one race has been imposed upon or accepted by those of another race.

This philological development led to the coining of the word "Aryan," taken from the Vedic or old Sanscrit and Zend, and all persons speaking or having spoken one of the so-called "Aryan" tongues, i. e., one of the Sanscrit, Iranian, Slavonic, Gothic, Celtic, Latin, Greek group of languages were called "Aryans" and recognized as belonging to a white race, leading to the manifest absurdity of classing among whites the black Dravidian inhabitant of Ceylon and Southern India, because he spoke a dialect or descendant of Sanscrit, and the almost equally dark inhabitant of Southern Persia because he spoke a modern Persian dialect or descendant of ancient Iranian, and excluded from the "Aryan brotherhood" of whites the Magyars, the Finns, and the Turks because they spoke tongues of the Ugric or Turanian group, and the Basques because they spoke a language of a kind all to itself.

The ethnological and historical absurdity of this became apparent. The history of India showed that a conquering white complexioned race had imposed their language upon a dark complexioned race now called Dravidian, and had become submerged into its enormously preponderant population, notwithstanding the determined effort to prevent it by the institution of a rigid system of caste; and that a similar result had taken place in Persia. The term "Aryan" has thus become more or less discredited, and has been (at least in its application to the family of languages) succeeded largely by that of Indo-European. During this philological-ethnological attempt to adapt present physical conditions to past linguistic ones, the point of supposed original distribution of the white races shifted. Blumenbach, who does not appear to have known either the Sanscrit or Iranian tongues, placed it in the Caucasus. His successors—whom Huxley calls "brilliant Uhlans"—removed it to the Hindoo-Koosh-Pamir region, the

supposed home of the speakers of Vedic and Zend, and Latham attempts to place it on the Sarmatian plains.

Ethnologists and philologists do not agree as to this, nor do they agree as to who are the white races. They will rank different peoples as "Aryans" or "Indo-Europeans" or "Semites" or "Hamites," differing even as to who are included in these; but when it comes to "white" no agreed classification exists. The term white is generally joined to some other by the word "or," viz., Aryans or white races, etc.

If there be no such race as the "Caucasian race," and the term Caucasian be incorrect as properly describing the white races, then the whole argument based upon the Syrian being one of a Caucasian race falls to the ground. It may be added that up to this time neither history nor archeological investigations seem to show that any Semitic speaking race came from the Caucasian region. Their recorded movements are apparently from the south and the east.

A Syrian not only would not appear to be of a Caucasian race, but it does not appear clear that he is of a Semitic race.

The applicant and his friends claim among other grounds to be Semites because they speak a so-called Semitic tongue, viz., Arabic. The Berbers and Moors of Northern Africa and the modern Egyptians also speak Arabic, yet none of them are classed as Semites. Does the history of Syria bear out their contention?

By Syria is generally included all that part of Asia lying east of the Mediterranean Sea, south of the Amanus branch of the Taurus range of mountains, west of the Arabian or Syrian desert, and north of the boundary of Egypt, say north of a point somewhat over 100 miles south of Jerusalem. It is exceedingly difficult to trace the "origin" of any very ancient people, but when history opens, this region seems, according to present acceptance, to have been in possession of a people called Hittites or "Khatti." Their language is still a mystery, but from their sculptured representations and the few proper names that survive in other languages, and their pictured representations on extant sculptures, they are generally supposed to have been a non-Semitic, possibly a Mongolic race. The central and southern part of this region next apparently was under Egyptian rule. Whether that rule was only that of a military government or tax gatherer, or included any interpenetration of Egyptian settlers, it does not seem possible to say. This rule in turn seems to have been succeeded by another Hittite dominion. It does appear that subsequent thereto occupation was taken by people speaking a Semitic tongue. The Phoenicians first, and with them apparently Arameans, and then the Hebrews. Whether this was a complete dispossession or an amalgamation of the conquerors with the Hittite population, the latter taking the language of their masters, cannot yet be told.

It has been suggested that it was this Hittite peoples of a different race (the accursed inhabitants of Canaan) that the invading Hebrew was told so savagely to destroy. Deut. vii, 2, and xx, 16, 17.

The historical record in the Old Testament tells us that nothwithstanding this injunction many of the inhabitants were spared and con-

tinued to occupy the land, afterwards the land ruled by the Hebrews, and doubtless to mix and amalgamate with their conquerors. Uriah, the Hittite, was an officer in the army of David.

As the mist clears, the Hittite dominion overthrown, we find the country as to the southern part in Hebrew hands, as to the coast and center in Phœnician, and as to the north, toward Damascus and beyond in what may be termed Aramean, or according to Winckler, mixed Hittite and Aramean, but all speaking a Semitic language. Then come the invasions: First, the Assyrian with its recorded depopulation, and the removal of the people and the substitution of others. Next, the Babylonian, with a like sequence, intermixed with Egyptian inroads, and then the Persian, to the clemency of whose sovereigns according to the Bible record was due the restoration of the Jew to Jerusalem, surrounded by a population whose race and descent is not known, but who were apparently not regarded by the Jews as a part of them.

After the Persian dominion, came the conquest of Alexander, and the overlordship of his successors, during whose dominion parts of the country seem to have been largely Hellenized, both in immigration and language. Large parts of Syria were inhabited by a Greek speaking people (although not necessarily of Greek descent), and the words of Christ though supposed to have been spoken in Aramæic have been transmitted (excepting His last words on the cross) to us in Greek. Then came the Roman conquest, the destruction of Jerusalem, and the devastation of the country and wasting of the people that preceded the Pax Romana. Greek influences seem to have continued and Greek overlordship held good under the Byzantine Emperors, varied only by temporary raids and control of the Persian Sasanians until the Arabian Mohammedan storm swept over the land in the seventh century, crushing and killing all that opposed: Then followed the crusades, with the temporary Latin military occupation of Jerusalem and a small part of lower Syria for about a century, and in 1260 the terrible and ruthless Mongolian invasions under the dynasty of Jenghis Khan, that invasion which literally destroyed Bagdad and its inhabitants and largely populated Persia with a Mongol people. And then finally, in 1516, the Turkish victory over the Arabic overlordship and the Turkish conquest and occupation of the country.

Now of what race are the Syrians? They no longer speak Hittite or Phœnician or Syriac or Greek; they speak Arabic, but that does not show them to be Semites, for so do the Berbers and Moors and Egyptians of North Africa. They are not Aryan or Indo-European. They may be a mixture of every race that has possessed the country. How large the Turkish and Mongolian intermixture may be cannot be told. Syria, according to the accounts, varies: In the north its inhabitants are Turkish more or less mixed. In the south its inhabitants are Arabian largely mixed with African blood. In the center is the Lebanon District, the ancient Phœnician country, from which the applicant comes. This is largely inhabited by the peoples known as Maronites, who are Christian, and the Druses, who are Mahommedan of a

peculiar sect.  Both speak Arabic—an impure Arabic according to some travelers.

The present applicant comes from Batrun or Batroun on the coast of the Lebanon District.  That is, he comes from the coast in ancient times occupied by the Phœnicians.  Batroun is between Beirout and Tripoli near the site of the ancient but long destroyed Phœnician city of Gebal, called by the Greeks Byblos.  He is a Maronite—a Christian.

The inhabitants of this region are said by some accounts to average lighter in color than the inhabitants of the rest of Syria, although there are many dark ones among them.  The Mahommedan Druses are said to be lighter than the Maronites, but taken as a whole the inhabitants of this district are very considerably darker in complexion than Europeans.  Their complexions are said to have a yellowish tinge more characteristic of the Turk and Mongol than the olive of southern Europe or the brown of the Arab.  And these accounts agree with the appearance of the usual Syrian immigrant in this country with some striking exceptions.  The representatives of the Syrians before the court have claimed that their features show them to be of Semitic race, but the presiding judge confesses himself unable to say that such is the case, and equally unable to say, from ocular inspection as well as from the historical facts so far as they exist, whether the modern Syrian is basally in race a Hittite, a Phœnician, an Aramaean, an Arabian, or a Mongolian, or a compound of all.

The mere fact of habitancy in a country once occupied by another race is not of itself proof of descent from that race.  The Mongol or Bedouin herdsman who occupies the sites of those cities is not thereby entitled to claim descent from the builders of Nineveh and Babylon.  The modern swart Arabic speaking fellahin of modern Egypt is not from that circumstance alone to be taken as a descendant from the builders of the Pyramids and the carvers of the hieroglyphic writings.

There is no known ocular, microscopic, philological, ethnological, physiological, or historical test that can settle the question of the race of the modern Syrian; but the applicant and his associates are certainly Asiatics in the sense that they are of Asian nativity and descent and are not Europeans.

There is no known reason based on physiological or philological data for joining the Semitic races to the Indo-European races as one branch or variety of the human race greater than there is for joining the Turanian races to them.

The reason why Blumenbach and his school joined them does not seem to have been on grounds of complexion or language, but because they had been in historical contact and seemed to share a common spiritual and intellectual heritage, a wholly misleading circumstance.  The beginnings of modern civilization, according to recent archæological discoveries, go back to Ancient Babylonia and Ancient Egypt, where apparently independently the arts and practices from which have developed modern civilization, learning, and religious exercises, first took definite shape.  Yet the first beginners in Babylonia were Sumerians or Akkadians, an apparently non-Indo-European and non-

Semitic race, and the first Egyptians were also of another race now called the Hamitic. And neither of these races would now be claimed as either white or Caucasian.

The so-called Semitic races may be superior races to the so-called Indo-European. Their spiritual and intellectual legacy to the world may be of a higher value, but these circumstances do not justify their inclusion with the latter as one branch to be styled Caucasian and the exclusion of other races.

When it comes down to strict logical analysis, the inhabitant of Syria, if he cannot rest on complexion, must find other grounds than race, habitancy, or language, to establish any community of race with the European races assuming those last to be the white race.

The claim that the admission of the European Jew to citizenship would include the admission of the Syrian, as both are Semites, is not apparently well founded under either the racial or geographical interpretation of "white persons" in the statute. It is most difficult, according to ethnological authorities, to attempt to class the European Jew as a separate people in any racial sense. The term Jew as applied to Europeans means as a rule a religious not a racial distinction. The European Jews have many of them resided longer in their present European quarters than the Christian nations among whom they live. The Jew in Portugal, Spain, Italy, and Hungary may well have been there before the Goth, the Visigoth, the Lombards, the Vandals, and the Huns overran those countries. The European Jew has become racially, physiologically, and psychologically a part of the peoples he lives among. He speaks their tongues, he thinks their thoughts, and his blood is as intermingled with theirs as theirs is with his. No one can tell how much Jewish blood has been incorporated with the Christian peoples of modern Europe, and no one can tell how much so-called Aryan blood runs in the veins of the modern European Jew. He varies in complexion as much as other Europeans. The Jew of Northern Germany and Northern Russia is frequently blue eyed and fair haired. The Jew of Spain and Portugal is as dark as his fellow citizens. The modern European Jew is practically the same as any other modern European. The theory that the modern European Jew has as a general rule any marked difference in physiognomy differentiating him as a "Semite" from other Europeans has after careful examination been discarded.

But there are communities professing the Jewish religion in North Africa and the east who are as dark as Negroes or the peoples among whom they live, and who probably by intermixture of blood are physiologically the same.

The European Jew is as white as the peoples among whom he lives, and the African or Asiatic Jew as dark. The exclusion of the last two has no connection with the admission of the first. A professing Jew from Syria who was not of European nativity or descent would be as equally an Asiatic as the present applicant, and as such not within the terms of the statute.

The other arguments based upon the particular merits of the inhabitants of the Lebanon District of Syria and the inferences to be drawn

from the fact that the Jewish and Christian religions took their rise among peoples at that time inhabiting Syria are appeals to considerations to be addressed to Congress and not to a court of law.

The modern inhabitant of the Lebanon District, it may, however, be said, does not inhabit the scene either of the followers of the religion exhibited in the Old Testament or of the labors of Christ. That is the southern part of Syria commonly called Palestine. The coast of the Lebanon District is Phœnicia, whose inhabitants, so far from professing the monotheistic and ethical tenets of the Old Testament, were the followers prior to their conversion to Christianity of rites and beliefs held up as among the most repulsive (according to modern ideas) of all those of the ancient historical worlds.

Let it be as claimed in the argument for the applicant that Christ appeared in the form of the Jew and spoke a Semitic language. The apostrophic utterance that He cannot be supposed to have clothed His Divinity in the body of one of a race that an American Congress would not admit to citizenship is purely emotional and without logical sequence. The test imposed by Congress is not a religious one. The matter regulated is a purely secular domestic one. The pertinent statement rather is that a dark complexioned present inhabitant of what formerly was ancient Phœnicia is not entitled to the inference that he must be of the race commonly known as the white race in 1790, merely because 2,000 years ago Judæa, a country whose inhabitants have since entirely changed, was the scene of the labor of one who proclaimed that He had come to save from spiritual destruction all mankind. An attempt to consider the question on racial lines reveals to the investigator how difficult it is to come to any conclusion as to the nationalities of Europe alone. It may be that there are some Scandinavian or Slavonic communities that are comparatively of pure blood, but it is beyond human power to say how much Tartar blood there is in Russia; how much Slavonic blood in Prussia, and Germany generally; how much Teutonic and Celtic blood in France; how much Celtic and Iberian blood in Ireland; how much Celtic, Latin, and Saxon blood in England; how much Iberian, Celtic, Gothic, Arabic, and Moorish blood in Spain; how much blood from the ancient historical world in Italy; how much European blood there is in the European Jew; and how much Jewish blood in all Europe. If this be true as to Europe, the difficulties appear infinitely greater with regard to Asia, and its mixed peoples of every shade except white.

The conclusion is that it becomes a matter of futile speculation.

The broad fact remains that the European peoples taken as a whole are the fair skinned or light complexioned races of the world, and form the peoples generally referred to as "white" and so classed since classification based on complexion was adopted. All of which foregoing discussion may seem wholly out of place in a reasoned legal opinion as to the construction of a statute, except as illustrating the Serbonian bog into which a court or judge will plunge that attempts to make the words "white persons" conform to any racial classification.

The real question is: What does the statute mean, to whom did the terms "free white persons" refer in 1790, in the understanding of the makers of the law? ·

Blumenbach's "Caucasian" classification was certainly not generally known or current in the United States in 1790. His work was not translated into English and published until 1807, and then it was published in London. The United States had been settled by European peoples. They were in 1790 a busy, occupied, hardworking people, with very few libraries, few colleges, and not many schools. It is safe to assume that no member of the congress that passed the act of 1790 knew either Sanscrit or ancient Persian, or had the remotest idea of the connection between the Aryan or Indo-European languages. He would certainly have repudiated the idea that a black Ceylonese or a dark South Persian was in the language of the enthusiastic supporters of the theory that all speakers of Aryan languages are of one race, an "Aryan brother." His general idea of Western Asia generally was that it was ruled by the "Grand Turk" or the "Sublime Porte," and inhabited by Turks and Mohammedans of the pernicious and obnoxious nature of the inhabitants of the Barbary States. American missionaries had not yet penetrated those mystic regions, and brought back accounts of the peoples who inhabited them. All the average citizen of the states knew of Syria was derived from Greek and Latin historians, perhaps supplemented by Rollin's History, or some other synopsis of the same kind, followed by the impression from the history of the crusades that the Mohammedan or Saracenic conquest had obliterated the ancient inhabitants. All the world was foreign, unknown, and black to him except the American Indians (whom he counted almost as vermin) and the inhabitants of Europe, from whence he or his fathers came. He neither expected nor desired immigrants from any other quarter. Certainly not from Syria, the emigration whence has only been of late years. He never saw or heard of elaborate classification of mankind based on skulls or languages or measurements of the tibia or toes. His only classification was "color." The belief in the descent of all men from Adam still was accepted. The rightfulness of slavery as approved by all ancient codes, including the Old Testament, was also still generally accepted in America, although by many it was then accompanied with the modification that the right must be exercised by a superior over an inferior race. The average citizen of the states was at that time firmly convinced of the superiority of his own white European race over the rest of the world, whether red, yellow, brown, or black. He had enslaved many of the American Indians on that ground. He would have enslaved a Moor, a Bedouin, a Syrian, a Turk, or an East Indian of sufficiently dark complexion with equal readiness on the same plea if he could have caught him. The opposite west coast of Africa was accessible for the slave supply; the other sources were not, and the trader who went to get his slaves from them was likely to be made a slave himself.

So far· as the knowledge of the·writer of this opinion goes, the person in public political life who appears from written expressions to

have had any extended idea on the subject and who may have doubted the descent of all men from Adam was Thomas Jefferson, and he doubted it with Voltaire on general principles of reason, and not on the scientific arguments of to-day, and Jefferson was not a member of the Congress that passed the statute of 1790.

"White persons," therefore, to the average citizen of the United States in 1790, would seem to have meant Europeans, and when he used the words "aliens being free white persons" he could only have referred to Europeans.

With this interpretation of the statute the eligibility of any applicant for naturalization on this ground can be determined by a fixed uniform rule. The judge need neither examine his complexion with a microscope nor measure his skull or his limbs or features, nor inquire into his paternity and maternity for past several generations. The test becomes mainly one of geography.

Is the applicant from Europe and a member of the peoples inhabiting Europe, and there regarded as white, or a descendent of an emigrant from them? If he is, he is entitled to naturalization if he be otherwise fit for it. If he is not, if he is an Asiatic, whether Chinese, Japanese, Hindoo, Parsee, Persian, Mongol, Malay, or Syrian, he is not entitled to the privilege of naturalization, no matter what his fitness otherwise may be.

The argument that the statute as it stands may be arbitrary, illogical, unjust, even absurd in its provisions, in that it makes color, race, or geographical habitancy, and not moral and mental merit, the basis for granting the privilege of citizenship, is one to be addressed to Congress and not to a court of law.

Nothing could be more difficult and invidious for a court to attempt than to determine an applicant's right to naturalization upon any ground of complexion or race. No matter who may be refused, if the applicant does not apply on the basis of being of African nativity or African descent, the refusal is construed as meaning that the applicant is not a white person and is therefore of an inferior race. Still the statute is there and requires the court to exclude the applicant unless he be a "white person" and it is the duty of the judge to obey. Under the construction of the statute as it appears to this court to be based on reason, authority, and the history of the legislation, the difficulty disappears and the refusal can carry no sting to the applicant, whether a Syrian or a Japanese.

For the reasons stated in this opinion and in the former opinion in this case, filed February 18, 1914, and reported (D. C.) 211 Fed. 486, and in the opinion in Re Shahid, filed June 24, 1913, and reported in (D. C.) 205 Fed. 812, all of which should be read and taken together as forming the final conclusion and decision of the court, the order made refusing the application on the ground that the applicant is an Asiatic is affirmed. Whether he is of a white race, or whether the modern Syrians are racially or intrinsically free white persons, or whether any other Asiatic people is also of white race, is not decided as not pertinent to the issues of the application. All that the court decides is that the applicant, not being of European nativity or de-

scent, is not a white person within the meaning of the naturalization statute.

As the matter involves the construction of a statute law of the United States, it is to be hoped that an appeal from this order will be taken to the Supreme Court of the United States and a settlement had of this most vexed and difficult question.