### In re Camille.

(*Circuit Court, D. Oregon.*   November 2, 1880.)

**1. Naturalization—White Person.**

A person of half white and half Indian blood is not a " white person," within the meaning of this phrase as used in the naturalization laws, and therefore he is not entitled to be admitted to citizenship thereunder.

Petition to be Admitted to Citizenship.

Deady, D. J.   Frank Camille petitions to be admitted to become a citizen of the United States, under section 2167 of the Revised Statutes, as an alien who has resided in the United States the three years next preceding his arriving at the age of 21 years, and without having made the declaration of his intentions in that respect required in the first condition of section 2165 of the Revised Statutes.

From the evidence it appears that the applicant was born at Kamloops, in British Columbia, in 1847, and at the age of 17 came to Oregon, where he has ever since resided, and that he is otherwise entitled to admission, if he is a "white person," within the meaning of that phrase as used in section 2167 of the Revised Statutes, as amended by the act of Feb-

ruary 18, 1875, (18 St. 318.) His father was a white Canadian, and his mother an Indian woman of British Columbia, and he is, therefore, of half Indian blood.

*In re Ah Yup,* 5 Sawy. 155, it was held by Mr. Justice Sawyer that the words "white person," as used in the naturalization laws, mean a person of the Caucasian race, and do not include one who belongs to the Mongolian race. In the course of the opinion he says: "Words in a statute, other than technical terms, should be taken in their ordinary sense. The words 'white person,' as well argued by petitioner's counsel, taken in a strictly literal sense, constitute a very indefinite description of a class of persons, where none can be said to be literally white, and those called white may be found of every shade from the lightest blonde to the most swarthy brunette. But these words in this country, at least, have undoubtedly acquired a well-settled meaning in common popular speech, and they are constantly used in the literature of the country, as well as in common parlance. As ordinarily used everywhere in the United States, one would scarcely fail to understand that the party employing the words ' white person' would intend a person of the Caucasian race."

From the same reasons it appears that the words "white person" do not, and were not intended to, include the red race of America.

Chancellor Kent, in considering this subject, (2 Com. 72,) says that "it may well be doubted" whether "the copper-colored natives of America, or the yellow or tawney races of the Asiatic," "are ' white persons ' within the purview of the law."

In all classifications of mankind hitherto, color has been a controlling circumstance, and for that reason Indians have never, ethnologically, been considered white persons, or included in any such designation.

From the first our naturalization laws only applied to the people who had settled the country—the Europeans or white race—and so they remained until in 1870, (16 Stat. 256; § 2169 Rev. St.,) when, under the pro-negro feeling, generated and inflamed by the war with the southern states, and its political consequences, congress was driven at once to the other

extreme, and opened the door, not only to persons of African descent, but to all those "of African nativity"—thereby proffering the boon of American citizenship to the comparatively savage and strange inhabitants of the "dark continent," while withholding it from the intermediate and much-better-qualified red and yellow races.

However, there is this to be said in excuse for this seeming inconsistency: the negroes of Africa were not likely to emigrate to this country, and therefore the provision concerning them was merely a harmless piece of legislative buncombe, while the Indian and Chinaman were in our midst, and at our doors and only too willing to assume the mantle of American sovereignty, which we ostentatiously offered to the African, but denied to them.

The conclusion being that an Indian is not a "white person" within the purview of the naturalization laws, the question arises, what is the *status* in this respect of the petitioner, who is a person of one-half Indian blood? In Louisiana, if the proportion of African blood did not exceed one-eighth, the person was deemed white; and this was the rule in the colonial *code noir* of France, and approved in Carolina. 2 Kent. 72, note *b*.

In Ohio it has been held that a person nearer white than black or red was a white person, within the provision in the state constitution of 1802, limiting the privilege of voting to the "white male inhabitants," etc.; but that where the colored blood was equal to or preponderated over the white blood, the person was not white.

In *Jeffries* v. *Ankeny*, 11 Ohio, 372, it was held that the offspring of a white man and a half-breed Indian woman was a voter; "that all nearer white than black, or of the grade between the mulattoes and the whites, were entitled to enjoy every political and social privilege of the white citizen." See *Gray* v. *The State*, 4 Ohio, 353; *Thacker* v. *Hawk*, 11 Ohio, 377; *Lane* v. *Baker*, 12 Ohio, 237.

Upon these authorities, and none other have come under my observation, the petitioner is not entitled to be considered a white man. As a matter of fact, he is as much an Indian

as a white person, and might be classed with the one race as properly as the other. Strictly speaking, he belongs to neither.

The power to say when and under what circumstances aliens may become American citizens belongs to congress. Citizenship is a privilege which no one has a right to demand; and in construing the acts of congress upon the subject of naturalization, the courts ought not to go beyond what is plainly written.

The petitioner is not a "white person" in fact, nor can he be so considered upon any reasonable construction of the statute, or within any rule that has ever been promulgated on the subject.

The application is denied.