### In re AKHAY KUMAR MOZUMDAR.

(District Court, E. D. Washington, N. D. May 3, 1913.)

No. 992.

1. ALIENS (§ 61*)—NATURALIZATION—PERSONS CAPABLE—"FREE WHITE PERSONS."

Rev. St. § 2169 (U. S. Comp. St. 1901, p. 1333), extending the privilege of naturalization to "free white persons," confers that privilege only upon members of the Caucasian race.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 119–122; Dec. Dig. § 61.*]

2. ALIENS (§ 61*)—NATURALIZATION—PERSONS CAPABLE—HIGH-CASTE HINDU.

An applicant who testifies that he is a high-caste Hindu of pure blood, and that such Hindus have always considered themselves as members of the Aryan race, is entitled to naturalization as a white person.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 119–122; Dec. Dig. § 61.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In the matter of the application of Akhay Kumar Mozumdar to become a citizen of the United States. Application granted.

George W. Tyler, U. S. Naturalization Examiner, of Seattle, Wash.

Will G. Graves, of Spokane, Wash., amicus curiæ.

RUDKIN, District Judge. On the 11th day of July, 1912, Akhay Kumar Mozumdar filed his petition in this court to be admitted to citizenship in the United States, and the petition came on regularly for hearing on the 28th day of the ensuing December. At that hearing it was made to appear to the satisfaction of the court from the testimony of the applicant and two witnesses that the applicant has resided continuously in the United States and in the state of Washington for the requisite statutory period; that during that time he has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same; and that he is in all respects qualified for citizenship, provided he is a white person within the meaning of the Naturalization Acts.

On the latter question the testimony offered was very meager. The applicant was not represented by counsel, and the questions propounded by the Naturalization Examiner, representing the government, simply brought out the fact that the applicant is a native of India, and that his ancestors for generations before him were natives of that country. From this testimony and the appearance of the applicant, the court was not fully satisfied that he was a white person within the meaning of the law, and a formal order was entered denying the petition, with leave to file a petition for a rehearing, if the applicant were so advised. Such a petition has been filed, and at the request of the court Mr. Will G. Graves, of the bar of this city, kindly consented to appear in the matter, and has filed an able and exhaustive brief covering the entire subject under consideration. His intervention has greatly aided the court and lightened its labors in determining the question presented for decision.

On the rehearing the petitioner was further examined, and his testimony has been well summarized by counsel appointed by the court as follows:

"I come from the northern part of India, from the part of India that is customarily spoken of as Upper India, or what is known as Hindustan proper. I am a high-caste Hindu of pure blood, belonging to what is known as the warrior caste, or ruling caste. The pure-blooded Hindus are divided into three castes—the priestly caste, the warrior or ruling caste, and the merchant caste. The blood is kept pure by rigid rules of exclusion. Any one who marries outside of his caste is ostracized, and is disinherited by the native law. None of the high-caste Hindus will have anything to do with him. Marriage outside of the caste is not often known. Very few of the high-caste Hindus come to the United States. The great bulk of the Hindus in this country are not high-caste Hindus, but are what are called sihks, and are of mixed blood. The laboring class, those who do the rough manual labor, are not high-caste Hindus at all, but are in an entirely separate class, having quite a different religion and a different ancestry. The high-caste Hindus are of Brahmin faith, and in India are clearly distinguished from all of the other inhabitants, including the aborigines of the country, or the hill tribes, and

also the descendants of the invaders, those of the Mohammedan faith. The high-caste Hindus comprise perhaps one-fourth of the natives of India. The high-caste Hindus always consider themselves to be members of the Aryan race, and their native term for Hindustan is Arya-vartha, which means country or land of the Aryans."

[1] Section 2169 of the Revised Statutes (U. S. Comp. St. 1901, p. 1333), relating to naturalization, provides as follows:

"The provisions of this title shall apply to aliens being free white persons and to aliens of African nativity and to persons of African descent."

The provision relating to free white persons has found a place in our naturalization laws from the beginning, except for the brief period between 1873 and 1875, and the provision relating to aliens of African nativity and to persons of African descent was first incorporated after the adoption of the thirteenth amendment to the Constitution of the United States, abolishing slavery. In the original naturalization act the expression "free white persons" was doubtless primarily intended to include the white emigrants from Northern Europe, with whom the Congress of that day was familiar, and to exclude Indians and persons of African descent or nativity. Beyond this, perhaps, Congress had no definite object in view. It could not have foreseen the vast immigration problems with which the government is now confronted, or the difficulties which might hamper and embarrass the courts in the administration of the law. But, whatever the original intent may have been, it is now settled, by the great weight of authority, at least, that it was the intention of Congress to confer the privilege of naturalization upon members of the Caucasian race only. In re Ah Yup, 5 Sawy. 155, Fed. Cas. No. 104; In re Saito (C. C.) 62 Fed. 126; In re Camille (C. C.) 6 Fed. 256; Matter of San C. Po, 7 Misc. Rep. 471, 28 N. Y. Supp. 383; In re Buntaro Kumagai (D. C.) 163 Fed. 922; In re Knight (D. C.) 171 Fed. 297; In re Najour (C. C.) 174 Fed. 735; In re Halladjian (C. C.) 174 Fed. 834; United States v. Balsara, 180 Fed. 694, 103 C. C. A. 660.

[2] It is likewise true that certain of the natives of India belong to that race, although the line of demarcation between the different castes and classes may be dim and difficult of ascertainment. The difference between daylight and darkness is apparent to all; but where is the dividing line, and where does daylight end or darkness begin? So it is with the races of mankind, where miscegenation has been in progress for generations. The system of castes has existed in India for upwards of 20 centuries, and religion and law have done much to maintain that system and to prevent corruption of blood; but experience teaches us that religion and law have not always triumphed over nature. After referring to this system, and to the efforts made to maintain it, the historian Le Bon says:

"But in the course of the centuries nature triumphed over these formidable prohibitions. Woman always has her charms, no matter how inferior she may be in caste. In spite of Manu, crossings of caste were numerous, and one need not travel India throughout to perceive that, to-day, the populations of all the races are mixed to a large extent. The number of individuals white enough to prove that their blood is quite pure is very restricted. The word 'caste,' taken in its primitive sense, is no longer a syno-

nym of color, as it used to be in Sanskrit, and, if caste had had only formerly prevailing ethnological reasons to invoke, it would have had no reason for continuing. In fact, the primitive divisions of caste have long since disappeared. They were replaced by new divisions, the origin of which is other than the difference of races, except in the case of the Brahmins who still form the less mixed portion of the population." Great Events by Famous Historians, vol. 1, p. 55.

I fully appreciate the fact that the lineage of the applicant in these matters must rest largely, if not entirely, upon his own testimony, and that the courts may be imposed upon; but they must administer the law as best they can until Congress sees fit to prescribe a more definite rule for their guidance. The testimony in this case satisfies me that the applicant has brought himself within the provisions of the Naturalization Act, and he will be admitted to citizenship accordingly, upon taking the oath prescribed by law.