DOW v. UNITED STATES et al.

(Circuit Court of Appeals, Fourth Circuit. September 14, 1915.)

No. 1345.

**1. ALIENS ☰61—PERSONS ENTITLED TO NATURALIZATION—"WHITE PERSONS" —SYRIAN.**

The term "white persons," as used in Rev. St. § 2169 (Naturalization Act March 26, 1790, c. 3, 1 Stat. 103, as amended by Act Feb. 18, 1875, c. 80, § 1, 18 Stat. 318 [Comp. St. 1913, § 4358]), authorizing the naturalization of aliens being "free white persons," is not to be construed according to its import in 1790, and, in view of the course of legislative discussion and enactment, includes a Syrian.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 119–122; Dec. Dig. ☰61.

For other definitions, see Words and Phrases, First and Second Series, White Person.]

**2. STATUTES ☰225—REPEAL—NEW STATUTE.**

A repealed statute has no force, and in arriving at the meaning of words used in a new statute the court must look to the meaning which they had at the time of its enactment.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 302, 303; Dec. Dig. ☰225.]

**3. STATUTES ☰225¾—CONSTRUCTION—HISTORY OF LEGISLATION.**

In the absence of an authoritative construction of words carried into the new enactment, the court must take into account the history of legislation, and be controlled by the generally accepted meaning of the words used at the time of the new enactment.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 306; Dec. Dig. ☰225¾.]

Appeal from the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. M. Smith, Judge.

Application by George Dow for naturalization was denied (211 Fed. 486), and on rehearing was again denied (213 Fed. 355), and applicant appeals. Reversed.

T. Moultrie Mordecai and Simeon Hyde, both of Charleston, S. C., for appellant.

J. Waties Waring, Asst. U. S. Atty., of Charleston, S. C. (Francis H. Weston, U. S. Atty., of Columbia, S. C., on the brief), for appellees.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

WOODS, Circuit Judge. [1] The appellant, George Dow, a Syrian, was denied naturalization on the sole ground that a Syrian of Asiatic birth is not a free white person within the meaning of the naturalization statute. After the first decision of the matter a rehearing was granted at the instance of other Syrians interested. In his two opinions the District Judge reached the conclusion, which he supported with remarkable force and learning, that the "free white persons" made eligible to naturalization by the statute included aliens of European nativity or descent, and no others.

The statute of 1790, with which legislation on the subject began,

provided "that any alien being a free white person may be admitted to become a citizen," etc. The subject of naturalization was before Congress on propositions for amendment or repeal and re-enactment of existing laws in 1795, 1798, 1802, 1813, 1814, 1816, 1824, 1828, 1848, 1862, 1867, 1868, 1873, 1874, 1875, 1876, 1882, 1894, 1898, and 1903. The section with which we are concerned now stands in these words:

"Sec. 2169. The provisions of this title shall apply to aliens being free white persons and to aliens of African nativity and to persons of African descent."

In 1790, when the first act was passed, immigration to this country was almost altogether from Europe; and doubtless the act of 1790 was intended mainly to provide for naturalization of aliens from Europe, and to deny naturalization to negroes. With other peoples this country had little intercourse and little concern. Accordingly the records of Congress indicate that the debates on the bill of 1790 related to European immigration. It is reasonably certain that congressmen had no knowledge of Blumenbach's classification of the races of men published in 1781, in which he makes one of the divisions the white or Caucasian race and includes in it "the western Asiatics on this side of the Caspian Sea and the Ganges"; for his work was not translated from the German and published in English until 1807. The science of ethnology had made little advance in 1790, and the notion of racial division and the meaning of the term "white" in a comprehensive sense as applied to men were probably quite vague and indefinite in the minds of legislators. Yet in not mentioning the people of Europe, and in extending the privilege of naturalization to any "free white person," it seems reasonable to think that the Congress must have believed that there were white persons natives of countries outside of Europe. The writers on the subject of that day, to say the least, were not agreed in the view that Europeans were the only white people.

If it be assumed, however, that the preponderance of the argument is strongly in favor of the conclusion that in 1790 the popular understanding was that people of European nativity or descent were white, and that all others were colored, and that legislators had not in definite view any persons as white, except those of European nativity or descent, that would not be conclusive of the construction to be given to the present statute. The popular conception of race division became more distinct as time went on. Blumenbach's work probably became known in this country soon after 1807, when it was published in English; and his division, though the basis of it is now discarded, seems to have been that generally accepted. The opinions of later writers are in accord with Blumenbach's that Syrians are to be classed as white people. Pritchard, Natural History of Man, 1848; Pickering, Races of Man, 1851; Figuier, The Human Race, 1872; Jeffries, Natural History of the Human Race, 1869; Brinton, Races and Peoples, 1901; Keane, World's Peoples, 1908. In the Dictionary of Races, contained in the Reports of the Immigration Commission, 1911, it is said:

"Physically the modern Syrians are of mixed Syrian, Arabian, and even Jewish blood. They belong to the Semitic branch of the Caucasian race, thus widely differing from their rulers, the Turks, who are in origin Mongolian."

We have, then, this condition: That in the numerous reconsiderations of the statute, when it was amended or repealed and re-enacted, the Congress must have been aware that certain Asiatics, near the Mediterranean Sea, including Syrians, were generally classed as white people. It seems to follow that, even if the Congress of 1790 considered that the law of that year would be understood to allow the naturalization of persons of European nativity or descent only, the legislators of later years could not have supposed that the term "free white persons" would carry that restricted meaning. This growth of popular and legislative conception of the meaning of "free white persons" from 1790 to 1875, the date of the last enactment on the subject, is the controlling factor in ascertaining the meaning legislators intended should be given to the words as they stand in the present law.

In addition to amendments at various times on other points, there was a repeal and a new statute in 1802, and partial repeals and new statutes in 1824 and 1828. In 1870 there was a vigorous debate on the proposition to amend the law by striking out altogether the limitation to "free white persons," so that all aliens without regard to race could be naturalized. This proposed amendment was defeated, but it resulted in the extension of the privilege of naturalization to "aliens of African nativity and African descent." In 1873 the report of the committee on revision of the laws omitted the limiting words, "free white persons." This report was adopted, and the limitation was thus removed, with the result that an alien of any race could obtain naturalization. Upon discovery of the omission in 1874, the Congress amended the law in 1875 by inserting the limiting words, "being free white persons and aliens."

Certainly it cannot be said that, after all this legislative discussion and reconsideration and enactment, the present statute must be construed in the light of the knowledge and conception of the legislators who passed the original statute in 1790, without respect to the more definite and general knowledge and conception which must be attributed to the legislators who, upon reconsideration of the whole subject, enacted subsequent statutes including that now in force.

[2, 3] A repealed statute has no force, and in arriving at the meaning of words used in a new statute the court must look to the meaning which the words had at the time of the new enactment. It is true that, if the words used in the old statute had received authoritative interpretation at the time they were used in the new statute, that meaning would be held to be carried into the new statute. But in this instance there had been no authoritative construction before the repeals and new enactments above set forth. In the absence of such prior construction, the court must take into account the history of legislation, and be controlled by the generally accepted meaning of the words used at the time of the passage of the new statute. Bate Refrigerating Co.

v. Sulzberger, 157 U. S. 1, 15 Sup. Ct. 508, 39 L. Ed. 601; Cambria Iron Co. v. Ashburn, 118 U. S. 54, 6 Sup. Ct. 929, 30 L. Ed. 60.

At the date of the new acts and amendments, especially the act of 1873, with its amendment of 1875, it seems to be true beyond question that the generally received opinion was that the inhabitants of a portion of Asia, including Syria, were to be classed as white persons. It is true that Syria and the contiguous countries of Asia near the Mediterranean have been subjected to many changes in their inhabitants through conquest and other causes, and that the present inhabitants have racial descent from many different sources. Yet, as the consensus of opinion at the time of the enactment of the statute now in force was that they were so closely related to their neighbors on the European side of the Mediterranean that they should be classed as white, they must be held to fall within the term "white persons" used in the statute. The statute has been given this more liberal construction, so as to include within the term "white persons" Syrians, Armenians, and Parsees. In re Halladjian (C. C.) 174 Fed. 834; In re Najour (C. C.) 174 Fed. 735; In re Mudarri (C. C.) 176 Fed. 465; In re Ellis (D. C.) 179 Fed. 1002; In re Balsara, 180 Fed. 694, 103 C. C. A. 660. And it seems that in accordance with this construction of the statute a large number of Syrians have been naturalized without question. It is significant that, in view of these decisions and this practice of the courts, the Congress has not seen fit to change the law.

Reversed.