# IN THE MATTER OF TAKAO OZAWA, A PETITIONER FOR NATURALIZATION.

## March 25, 1916.

*Aliens—Naturalization—Japanese*: A person of the Japanese race born in Japan, is not eligible to citizenship under the naturalization laws. Rev. Stat., sec. 2169.

*Petition for Naturalization.*

*Takao Ozawa,* petitioner, *pro se.*
*H. W. Vaughan,* U. S. District Attorney, and *J. W. Thompson,* Assistant U. S. Attorney, opposed.

CLEMONS, J. This petition for naturalization is opposed by the United States district attorney on the ground that

the petitioner, being, as the facts are, a person of the Japanese race and born in Japan, is not eligible to citizenship under Revised Statutes, section 2169, which limits naturalization to "free white persons" and those of African nativity and descent.    The other qualifications are found by the court to be fully established, and are conceded by the government.    Twenty years' continuous residence in the United States, including over nine years' residence in Hawaii, graduation from the Berkeley (Cal.) High School, nearly three years' attendance at the University of California, the education of his children in American schools and churches, the maintenance of the English language in his home, are some of the facts in his behalf.    And he has presented two briefs of his own authorship, in themselves ample proof of his qualifications of education and character.    He makes the main points that in the statute the word "white" is "not used to exclude any race at all" or in other words is used "simply to distinguish black people from others," and that even in a narrow sense of the word "white" the Japanese are eligible to citizenship.    Also, as to the word "free" in the expression "free white persons," the contention is made, that this word designates the quality of person and implies goodness, worthiness, excluding only improper persons.

The first contention is regarded by the petitioner as supported by the learned opinion of Judge Lowell in the case of *In re Halladjian,* 174 Fed. 834.  A brief discussion of this opinion is therefore called for, and may serve to enforce our own conclusions.    In the head-notes the court is reported as holding:

"That the word 'white' was used to classify the inhabitants and to include all persons not otherwise classified, not as synonymous with 'European,' there being in fact no 'European' or 'white' race as a distinctive class, or 'Asiatic' or 'yellow' race, including substantially all the people of Asia; and hence the term 'free white persons' included Armenians born in Asiatic Turkey."

This is a broad ruling, and although a ruling was required only as to the eligiility of Armenians, it may appear even broad enough to divide the eligible classes into Africans and *all others,* subject of course to the exception, created by a statute of later date, in the case of Chinese. Without questioning Judge Lowell's conclusion that Armenians are eligible to citizenship, it seems that he goes too far in saying, Id., 843, that:

"From all these illustrations, which have been taken almost at random, it appears that the word 'white' has been used in colonial practice, in the Federal statutes, and in the publications of the government to designate persons not otherwise classified."

His citation, for example, of the classification of the Massachusetts census of 1764, which included only whites, negroes, mulattoes, Indians, and "French neutrals," and that of the Rhode Island census of 1748, which included only whites, blacks, and Indians, would be far from proof that Oriental races, particularly the Japanese, or even the indefinite yellow race or races, were included or thought of at all. The most that would naturally be inferred from the use of the word "white" as a "catch-all," as Judge Lowell characterizes it, Id. 843, is the inclusion therein of all unclassified inhabitants *then in the country* and not as a rigid classification to endure for all time and to include particularly persons of the Oriental races or of the so-called "yellow" races, who, as will be seen, have always under accepted classifications been regarded as ethnologically distinct from the white race. And the fact that as occasion arose, from the presence of a noticeable number of Chinese or Japanese, those new-comers received in the census reports a special classification, weakens very much the extreme view which may be implied from Judge Lowell's opinion. If the word "white" was a catch-all, why was its use not generally continued, to include those later immigrants? Judge Lowell's opinion itself shows that when the

Oriental population, as represented first by the Chinese, came to be appreciable, beginning with the census of 1860, (i.e., at the first opportunity after the census of 1850), the word "white" ceased to be used as a catch-all to designate those people, but they were specially classified by race. Id. 844; also 842, quoting from the Eleventh Census, part 1, p. xciv. The adoption of such classification was due more reasonably to the fact that the population of Oriental peoples had become appreciable, than to any idea, such as Judge Lowell's, 174 Fed. 843-844, that it was "after the majority of Americans had come to believe that great differences separated the Chinese, and later the Japanese from other immigrants, [that] these persons were no longer classified as white." Too much is not to be inferred from the use of the words "white" and "black," or "white" and "Negro", in early times when these were undoubtedly the only, or practically the only, classes here other than the Indians. Nor is undue credit to be given to even much later, and recent, census classifications which were "not uniform in all parts of the country," Id. 842-843, or where much was left to the discretion of the director of the census. Id., 843. Far more reliance may fairly be placed upon the considered judgments of courts, rendered at least as early as 1878, or perhaps 1854, in contested cases,—upon the judgments of those whose peculiar duty it was to determine the meaning of this word "white."

Such a comprehensive meaning of the word "white" as that contended for, would include Indians, yet the Supreme Court in 1884 did not regard the statute, Revised Statutes, section 2169, as so broad. See *Elk v. Wilkins,* 112 U. S. 94, 104, also the considerably earlier case of *Scott v. Sanford,* 19 How. 393, 420, which says, "Congress might . . . have authorized the naturalization of Indians, because they were aliens and foreigners." If Indians were excepted, then why not also the races of the Orient, who though since found to be more adaptable to our manners and customs,

were in the earlier days regarded as strange peoples, of manners and customs incompatible with ours. The fact that more lately we have come to better appreciate, that, in the language of William Elliot Griffis ("The Japanese Nation in Evolution," 24):

"There is no necessary distinction between the Oriental and Occidental, the brown man and the white man. That the 'yellow brain,' and the Japanese heart are ultimately different from those of the Yankee or the Briton, is the notion of tradition, not the fact of science,"

does not justify the setting aside of an interpretation well-established prior to the date of any of the cases, an incomplete list of fourteen of which is submitted by the petitioner,—there being, it is understood, about fifty in all,—of Japanese who have been naturalized by State and Federal courts. The earliest of these fourteen cases, that of Seizo Matsumoto, naturalized by a court of Pierce County, Washington, is as recent as January, 1896, two years later than the case of *In re Saito,* 62 Fed. 126, and sixteen or more years subsequent to two cases which took a view broad enough to exclude Japanese: *In re Camille,* 6 Fed. 256, and *In re Ah Yup,* 1 Fed. Cas. 223, No. 104. Indeed, as early as 1827* Chancellor Kent, inclined to the same opinion as the two cases just cited, for he said in his Commentaries, volume 2, page 72:

"The act of Congress confines the description of aliens capable of naturalization to 'free white persons.' I presume this excludes the inhabitants of Africa and their de-

---

*Note the following very important additional evidence of what the word "white," as applied to the human race, meant to those learned in the law at the time when that word was first used in the statute; said Francis Lieber, in a treatise on the science of interpretation, published very shortly after Kent's work: "The word 'white' [in the Girard will, under which the beneficiaries were "white male orphans"] everyone knows is used to indicate the descendants of the Caucasian race, whose blood has remained unmixed with that of the Negroes, Indians, or that of any other *'colored'* race. The provision cannot be invalidated by the objection that no really white people exist." Lieber's Hermeneutics, 3d ed., 94-95.—C. F. C.

scendants; and it may become a question; to what extent persons of mixed blood are excluded, and what shades and degrees of mixture of color disqualify an alien from application for the benefits of the act of naturalization. Perhaps there might be difficulties also as to the copper-colored natives of America, or the yellow or tawny races of the Asiatics, and it may well be doubted whether any of them are 'white persons' within the purview of the law."

And in 1854, the dictum of Chief Justice Murray of California in *People v. Hall*, 4 Cal. 399, 403, 404, is that "the word 'white' has a distinct signification, which *ex vi termini* excludes black, yellow and all other colors."

In the case of *Ah Yup*, supra, in holding that Chinese are not white persons, Circuit Judge Sawyer in 1878 said:

"The words 'white person,' as well argued by petitioner's counsel, taken in a strictly literal sense, constitute a very indefinite description of a class of persons, where none can be said to be literally white, and those called white may be found of every shade from the lightest blonde to the most swarthy brunette. But these words in this country at least, have undoubtedly acquired a well settled meaning in common popular speech, and they are constantly used in the sense so acquired in the literature of the country, as well as in common parlance. As ordinarily used everywhere in the United States one would scarcely fail to understand that the party employing the words 'white person' would intend a person of the Caucasian race.

"In speaking of the various classifications of races, Webster in his dictionary says, 'The common classification is that of Blumenbach, who makes five. 1. The Caucasian, or white race, to which belong the greater part of the European nations and those of Western Asia; 2. The Mongolian, or yellow race, occupying Tartary, China, Japan, etc.; 3. The Ethiopian or Negro (black) race, occupying all Africa, except the North; 4. The American, or red race, containing the Indians of North and South America; and, 5. The Malay, or brown race, occupying the islands of the Indian Archipelago,' etc. This division was adopted from Buffon, with some changes in names, and is founded on the combined characteristics of complexion, hair and skull.

Linnaeus makes four divisions, founded on the color of the skin: '1. European, whitish; 2. American, coppery; 3. Asiatic, tawny; and, 4. African, black.' Cuvier makes three: Caucasian, Mongol, and Negro. Others make many more, but no one includes the white, or Caucasian, with the Mongolian or yellow race; and no one of these classifications recognizing color as one of the distinguishing characteristics includes the Mongolian in the white or whitish race.' See New American Encyclopedia, tit. 'Ethnology.'

"Neither in popular language, in literature, nor in scientific nomenclature, do we ordinarily, if ever, find the words 'white person' used in a sense so comprehensive. Yet, in all, color, notwithstanding its indefiniteness as a word of description, is made an important factor in the basis adopted for the distinction and classification of races. I am not aware that the term 'white person' as used in the statutes as they have stood from 1802 till the late revision, was ever supposed to include a Mongolian. While I find nothing in the history of the country, in common or scientific usage, or in legislative proceedings, to indicate that Congress intended to include in the term 'white person' any other than an individual of the Caucasian race, I do find much in the proceedings of Congress to show that it was universally understood in that body, in its recent legislation, that it excluded Mongolians. . . . Whatever latitudinarian construction might otherwise have been given to the term 'white person', it is entirely clear that Congress intended by this legislation to exclude Mongolians from the right of naturalization."

This case was determined four years before the enactment of a special statute prohibiting the naturalization of Chinese. 22 Stat. 58, 61. It is quoted at length to include its review of the then prevailing race classifications.

In 1880 in *In re Camille,* supra, 6 Fed. 257, Judge Deady approved of Judge Sawyer's view above quoted, though the case involved not a person of an Oriental race but one of Indian blood. See also the specific reference to the Chinese, Id., 258.

In 1894, Circuit Judge Colt, in the case of *In re Saito,* 62 Fed. 127, ruled directly on the eligibility of Japanese. He says:

"The history of legislation on this subject shows that Congress refused to eliminate 'white' from the statute for the reason that it would extend the privilege of naturalization to the Mongolian race, and that when, through inadvertence, this word was left out of the statute, it was again restored for the very purpose of such exclusion.

"The words of a statute are to be taken in their ordinary sense, unless it can be shown that they are used in a technical sense.

"From a common, popular standpoint, both in ancient and modern times, the races of mankind have deen distinguished by difference in color, and they have been classified as the white, black, yellow, and brown races.

"And this is true from a scientific point of view. Writers on ethnology and anthropology base their division of mankind upon differences in physical rather than in intellectual or moral character, so that difference in color, conformation of skull, structure and arrangement of hair, and the general contour of the face are the marks which distinguish the various types. But, of all these marks, the color of the skin is considered the most important criterion for the distinction of race, and it lies in the foundation of the classification which scientists have adopted."

Judge Hanford in the case of *In re Buntaro Kumagai,* 163 Fed. 922, 923, is of opinion that:

"The use of the words 'white persons' clearly indicates the intention of Congress to maintain a line of demarkation between races, and to extend the privilege of naturalization only to those of that race which is predominant in this country."

He cites in support of his opinion the cases of *Ah Yup* and *Saito,* supra, and also the case of *In re Yamashita,* 30 Wash. 234, 70 Pac. 482 (1902). His opinion is followed in the case of *In re Knight,* 171 Fed. 299, in which the applicant was one-quarter Japanese and one-quarter Chinese and in which Judge Chatfield holds, Id., 300, that neither Chinese

nor Japanese can be naturalized,—though, it is true, it was only necessary for him to hold for the purposes of the case, that the substantial element of Chinese blood was sufficient to exclude the petitioner, regardless of the eligibility of Japanese. And the Circuit Court of Appeals of the Fourth Circuit in *Bessho v. United States,* 178 Fed. 245, and Judge Cushman in *In re Young,* 198 Fed. 715, hold expressly that Japanese aliens are ineligible to citizenship.

To meet any argument that the enactment of a special statute prohibiting naturalization only of Chinese, implies the eligibility of the Japanese, who are not included in any special prohibition, reference is made to *In re Kanaka Nian,* 21 Pac. 993-994, 6 Utah, 259. (1889), and *Bessho v. United States,* 178 Fed. 245, 248, also *In re Ah Yup,* 1 Fed. Cas., 224, decided as above noted, before the enactment of the special prohibition against Chinese, *In re Saito,* 62 Fed. 127, and *Fong Yue Ting v. United States,* 149 U. S. 698, 716.

As against these authorities, no reported case is known in which a person of the Japanese race has been naturalized, in which the court has rendered a written opinion to justify its ruling or in which there has been a contest to evoke the most thorough consideration. There are recent judicial opinions, that the statute in its present form is not to be "construed in the light of the knowledge and conception of the legislators who passed the original statute in 1790, without regard to the more definite and special knowledge and conception which must be attributed to the legislators who upon reconsideration of the whole subject, enacted subsequent statutes including that now in force." *Dow v. United States,* 226 Fed. 145, 147. See also *In re Muddari,* 176 Fed. 465, 467, and a learned opinion of Judge Morrison of the Superior Court of California, rendered May 7, 1914, in the case of *In re Sakharan Ganesh Pandit.* But the *Dow* case, for example, in using the language just quoted and in referring to more recent legislation, had in mind

the legislation of 1875 in which the words "free white persons", omitted by error from the revision of 1873 (62 Fed. 127) were restored.   226 Fed. 147.   And, aside from the circumstance that the decisions just referred to were dealing with border-line cases of races closely related to what may be loosely called the "Europeans," who were perhaps in 1790 here considered as the only white people (226 Fed. 145, 147, 148), it is of most practical importance to bear in mind that the ethnological divisions which classed the Japanese as of the Mongolian or yellow race, were what the legislators of 1875 and the courts thereafter down even to the present have had to rely upon as their guides.   See quotation in *In re Ah Yup,* supra (1878) from Webster's Dictionary, probably the most widely circulated work in America except the Bible, and even the very recent edition of the Encyclopaedia Britannica, 11th ed., vol. 9, page 851. This classification was undoubtedly well known in this country early in the last century, as it was in Germany before 1790, the date of the original enactment of the statute.   Even if, as the petitioner contends, Blumenbach's classification is unscientific (see *In re Dow,* 213 Fed. 355, 358, 359, 365; *In re Mudarri,* 176 Fed. 466-467), nevertheless it has not yet been superseded so far as to assimilate the Japanese with what for many years, at least as early as 1854, and especially before 1875, has been generally regarded as the "white" race.*

Tylor, one of the highest authorities, in his book of 1881, "Anthropology" (Appleton's ed. 63, 96-98), points out that the Japanese have characteristics of the "Mongoloid type of man" in which one prominent feature is that "their skin is brownish yellow." The most recent encyclopaedic authority, 9 Enc. Brit. 11th ed. (1910), 851, classes the Japanese as Mongolic or yellow, though placing the Ainos, a small element of the people of Japan, as Caucasic or white.   See

---

*See also references to Kent and Lieber of the early 1800's, ante, p. 675.—C. F. C.

also 15 Id., 165.   In addition to this unobstructed current of authority reference may be had to a very late work, "A History of the Japanese People," by Captain F. Brinkley, included by Dr. William Elliot Griffis ("The Japanese Nation in Evolution," 20) in a list of the English scholars who "have made obsolete most of the old European learning about Japan."

"The Japanese are of distinctly small stature . . . Their neighbors, the Chinese and the Koreans, are taller. . . . . Nevertheless, Professor Dr. Baelz, the most eminent authority on this subject, avers that 'the three great nations of Eastern Asia are essentially of the same race,' and that observers who consider them to be distinct 'have been misled by external appearances.' "   Brinkley, History, etc. supra, 57-58, see also 59, 60.   That the Japanese have, however, an element of white, Caucasian or Iranian, blood is noted.   Id. 58, see also 45, 54, 55.

Another recent book may be quoted as giving the opinion of a Japanese educator, "The Life and Thought of Japan," by Okakura Yoshisaburo (published by E. P. Dutton & Co., 1913):

"And as to those swarms of immigration from China and Korea, who crossed the sea at various periods in the early days of Japanese history, it did not take many generations before they came to adopt the views of the people with whom it was their interest in every way to get mixed, and thus they lost their own identity.   In this manner, notwithstanding an extensive admixture of foreign elements to our original stock, we find ourselves as closely unified a nation as if we had been perfectly homogeneous from the very beginning.   One and the same blood is felt to run through our veins, characterized by one and the same set of religious and moral ideas.   This may perhaps be due to the fact that the three elements—the conquering, the conquered, and the immigrating—belonged originally to the same Mongolian race, with every little trace of any mingling of Ainu and Malayan blood."   Id. 48, 49.

"You will come, at least to some extent, to acknowledge the truth of the statement so often made in books on Japan, that there are two distinct racial face-types among the pres-

ent Japanese. . . . Be it remembered that both these types are Mongol. Both have the yellowish skin, the straight hair, the scanty beard, the broadish skull, the more or less oblique eyes, and the somewhat high cheekbones, which characterize all well-established branches of the Mongol race." Id., 41.

"The relation here displayed between the living and the departed may be considered as a characteristic of the Mongolian race to which both the Japanese and the Chinese belong." Id., 54.

Whether these views just quoted are wholly accurate or not, I do not undertake to say. They are at all events, in line with the statements of scientific works which have been, as already intimated, the guides of our courts in all cases known to have been contested or in which the court rendered a written opinion,—even though recognizing that there is in the Japanese an element of white blood. See reference to Brinkley, supra.

Dr. Griffis' interesting book, in a broad spirit of tolerance, notable because of his having been for forty years in closest touch with Japan and for some years a resident there, goes far to demonstrate the conclusion that "the Japanese are not Mongolian." "The Japanese Nation in Evolution," 400. Rev. Dr. Doremus Scudder, of Honolulu, who is himself intimately acquainted with the Japanese people, and who may be termed a friend of the court, has submitted in behalf of the petitioner, this authority as tending at least to support the view that the Japanese are "white persons" even in a narrow sense of those words. But Dr. Griffis, after all, does not seem to be at variance with the common authorities on ethnology. It is plain that he is speaking of the later development of the Japanese away from all that is narrow in the sense of "Mongolic" or "Oriental,"—of their "both deserving and winning success," Id., 400, in competition, or rather comparison, with the most progressive and enlightened peoples of the world. He recognizes the Mongolic element constantly. "White men, belonging to the great

Aryan family and speaking a language akin to the Indo-Germanic tongues, were the first 'Japanese,' who are a composite and not a pure 'Mongolian' race. Their inheritance of blood and temperament partakes of the potencies of both Europe and Asia." Id., 1, also 21, 25, 349. He also recognizes the Malay element, which,—at least "the Malay peoples of the Eastern archipelago,"—the last edition of the Encyclopaedia Brittanica includes in the Mongolic or yellow division of the races, though "less typical" but with the "Mongolic elements so predominant as to warrant inclusion." Says Dr. Griffis, Id., 30, "Those most familiar with the races, the Mongol, Aryan and the Malay, now so differentiated, consider that in the Nippon composite the Malay strain predominates." Also Id., 30-31 et seq. Though Dr. Griffis believes that "the basic stock of the Japanese people is Aino" (a white people) . . . "by 'basic stock' . . . mean(ing) the oldest race in the islands" (Id., 5, also 1), yet he speaks of the Ainos as having been "crowded out" (Id., 9)—elsewhere characterizing the process as absorption not elimination (Id., 26); and Brinkley, History, etc., supra 56, (see also 44), notes the "steady extermination for twenty-five centuries" of the Ainu element, characterized by him as having "left so little trace in the Japanese nation." Id., 58.

Intelligent men, of course, agree with Dr. Griffis that the words "Mongolian" and "Oriental", as mere epithets, can bear no sense of unworthiness or inferiority in the case of the Japanese people.

A few words are called for by the cited examples of the Magyars of Hungary and of the very dark Portuguese, who are both freely admitted to citizenship, in spite of the fact that the former are Mongolic in origin and that the latter are in a strict sense of the word not "white." Many of the decisions admit the difficulties inherent in the statutory classification, and even Judge Lowell has declared that he "greatly hopes that an amendment of the statutes will make

quite clear the meaning of the word 'white' in section 2169."
*In re Mudarri*, 176 Fed. 465, 467. Indeed in this latter
case his language seems to cast doubt upon the practic-
ability of the rule applied in the *Halladjian* case. He says,
176 Fed. 467:

"No modern theory has gained general acceptance.
Hardly anyone classifies any human race as white, and none
can be applied under section 2169 without making distinc-
tions which Congress certainly did not intend to draw; e. g.,
a distinction between the inhabitants of different parts of
France. Thus classification by ethnological race is almost
or quite impossible. On the other hand, to give the phrase
'white person' the meaning which it bore when the first nat-
uralization act was passed, viz., any person not otherwise
designated or classified, is to make naturalization depend
upon the varying and conflicting classification of persons
in the usage of successive generations and of different parts
of a large country."

But the examples just cited may be regarded as excep-
tional. Centuries before our first legislation on natural-
ization, the Magyars had "become physically assimilated
to the western peoples." 17 Enc. Brit., 11th ed., 393-394.
"In their new environment their Mongolic physical type
has gradually conformed to the normal European stand-
ard." Webster's New International Dictionary (1913), tit.
"Magyar", quoting A. H. Keane. They have long been "one
of the dominant people of Hungary—which they conquered
at the close of the ninth century", Id.; and they with the
Portuguese of varying degrees of color, are within the mean-
ing of "white", as commonly understood, and as explained
by Judge Cushman, in the case of *In re Young*, 198 Fed.,
716-717:

"The term 'white person' must be given its common or
popular meaning. As commonly understood, the expres-
sion includes all European races and those Caucasians be-
longing to the races around the Mediterranean Sea, whether
they are considered as 'fair whites' or 'dark whites', as classi-
fied by Huxley, and notwithstanding that certain of the

southern and eastern European races are technically classified as of Mongolian or Tartar origin.

"It is just as certain that, whether we consider the Japanese as of Mongolian race, or the Malay race, they are not included in what are commonly understood as 'white persons.'"

See also *Dow v. United States*, 226 Fed. 145, 147.

Though the intent of the word "white" is determinative of the case, we may well dispose of the petitioner's argument that the use of the word "free" in the expression "free white persons" emphasizes the element of worthiness, good quality, as against the element of color. The use of the word "free" in the debates in the Constitutional Convention in 1787 affords most reliable evidence of what the word meant at about and shortly before, its first use in the naturalization laws. It is recorded that Gouverneur Morris in moving to insert "free" before the word "inhabitants," with reference to the apportionment of members of the House of Representatives, used the word as the opposite of "slave." Madison's Journal of the Constitutional Convention (Albert Scott & Co., Chicago, 1893), 478. And such has always been its intent, not only when this statute had its origin but shortly after the Civil War when this statute was revived after a brief suspension—though the retention of the word "free" had then become unnecessary.

As lately as 1906 Congress went over the whole law of naturalization, and yet in the face of the well known rulings of the published decisions which had interpreted the particular section here in question, the section was left just as it was. This is a very persuasive reason for the conclusion that Congress acquiesced in, and adopted, the interpretation which the courts had put upon its own work. 226 Fed. 145, 148. The remedy for uncertainty in the statute, or for its unfairness or inconsistency with the theory and spirit of our institutions, lies, of course, with the legislative body.

In view of the foregoing authorities and considerations, the court finds that the petitioner is not qualified under Revised Statutes, section 2169, and must therefore deny his petition; and it is so ordered, in spite of the finding hereby made that he has fully established the allegations of his petition, and, except as to the requirements of section 2169, is in every way eminently qualified under the statutes to become an American citizen.

*Pending on appeal* in the Supreme Court of the United States, to which certified by the Circuit Court of Appeals.