In re SADAR BHAGWAB SINGH.

(District Court, E. D. Pennsylvania. December 11, 1917.)

ALIENS ☞61—NATURALIZATION—FREE "WHITE PERSON"—HINDU.

In view of the historical significance of the term, and its subsequent development, a member of the Hindu race cannot be admitted to citizenship under the statute which from 1790 to 1875, without change, has provided for the naturalization of free white persons; the term "white person" as used in the statute not necessarily including all Caucasians.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, White Person.]

In the matter of the naturalization of Sadar Bhagwab Singh. Sur motion for reargument on hearing of application for naturalization. Reargument refused, and application denied.

Robert S. Shaw, of Philadelphia, Pa., for the motion.
Thomas B. Shoemaker, Chief Examiner for Philadelphia, Pa., opposed.

DICKINSON, District Judge. If the answer to the question before us was to be found in the results of the researches of the ethnologists, the conclusions so forcibly and clearly stated in the able argument of counsel for this applicant might well be accepted. The legal question, however, which is the one really involved, is a narrower and more simple one, although perhaps not less difficult to answer.

We restate, for the purpose of giving the statement its utmost emphasis, that the applicant has been accorded a most sympathetic hearing, in which the representatives of the Bureau of Naturalization have shared, and that the objection raised neither expresses nor implies a

denial of the merits of the individual applicant, or of the race to which he belongs. The real question is whether the court has the legal power to admit the applicant to citizenship, and this depends upon the answer to the other question of whether Congress has as yet made any provision for the naturalization of men of his race. If it has not, the reason for the omission is obvious. It is because so few of his race have come to the United States that the question of their admission to citizenship has not become enough of a practical question to be dealt with by legislation.

As has before been remarked, admission to citizenship is a privilege granted, and is neither a right to be demanded nor one to be accorded on the personal or racial merits of the applicant, but, if a right, is one, the title to which is to be traced through some act of Congress. When, however, the conditions of the grant of the privilege are met, the privilege ripens into a right of the individual applicant, which cannot be arbitrarily denied.

This leads us by a short and direct path to the acts of Congress on the subject, but a few general observations may aid us to a clearer view of what is to be there found. It is doubtless true that the naturalization problem has grown in complexity and now presents features which were probably not in contemplation when the first laws on the subject were passed. This fact may demand more or less urgently a modification of the meaning of our laws. Such a demand, if it exists, should not blind us, however, to the line which separates interpretation from legislation. At the same time, the difficulties attending such legislation and the wisdom of avoiding the agitations which would accompany any attempt at legislation warned Congress of the danger of casting its meaning in too rigid a mold, and invites the courts to look for a warrant to give to the language employed by Congress the quality of elasticity. This warrant is found in the fact that Congress at intervals, as great as that between 1790 and 1875, employed the same words to express their meaning, although the meaning of the phrase employed had, in the common speech of the people, undergone a change in the meanwhile. There is at once found in our naturalization laws the thought of a double duty imposed upon the courts. They are commanded to reject some applicants and to admit others. In the performance of this duty they are to apply two tests. The one may be called the individual, the other the class, test. The former is in principle of easy application, and in the present case presents no difficulties. The difficulty in the use of the latter test is not so much in its application as in being sure we are applying the right test. It is clear Congress had in mind to designate by the phrase "free white person" a more or less definite class, and to deny citizenship to all others. The only real problem is to recognize the class, the members of which may be naturalized.

It may be helpful for the interpreter to put himself in the place of Congress for the purpose of forecasting what Congress might have done in order to get a clearer understanding of what it did. Congress might have chosen (and the strict letter of its language suggests this) what has been called the complexion or color test. The utter impracticability of applying such a test and the possible consequences led to

246 F.—32

its rejection.    Assuming the intention to have been to limit the privilege to those who were like unto themselves in blood, previous social and political environment, laws, usages, customs, and traditions, what has been called the geographical test (for which the representatives of the Bureau of Naturalization contend) might have been inserted in the law.    The absence of appropriate words expressive of this intention and the thought that Congress had a vision of what the United States has since become, the melting pot of almost all the nations of the earth, forbids us to take any such meaning from the law.    The like absence of philological and ethnological terms compels us to find that such a test was rejected.

By a process of elimination we are thus brought or driven to the only remaining test, which is this: Our people, when the first naturalization act was passed, had a really definite idea of those to whom the privilege of citizenship was to be extended.    The difficulty was, not in getting into accord upon the thought, but the difficulty was in finding a word or phrase which would express it.    Resort was had, as the only recourse, to the common speech of the people, which provided a phrase ready at hand, which expressed the thought meant to be conveyed. The phrase was "white person."    Its meaning was wholly conventional, and the convention evidenced by the meaning which the common man extracted from it.    It made no pretense to be a term of science, and was not chosen with a view to scientific definiteness or accuracy of expression.    It was at all events the nearest approach to definiteness of expression among all the words which were at the command of the lawmaker.    Precision would not be demanded until the expression came to be applied to a particular applicant, and the phrase would be then interpreted as Congress intended it to be.    It will thus be seen that the difficulties which confronted the lawmakers were not removed, nor were they surmounted otherwise than by the expedient of transferring them to the interpreter.    Our difficulties are indeed increased.    Classification is a necessity of speech, because it is a necessity of thought.    Very broad and very general classifications are relatively easy.    It is very difficult to make them definite.    In the end the limitations under which we labor drive us to a real or assumed convention. We more or less arbitrarily label the subject and classify according to the presence or absence of the label.    Our language, as is every other, is full of illustrations of conventions thus reached or imposed.    Our language is a living thing.    Because it is alive, it is ever changing. Words in the process of taking on accretions of meaning and of elimination become in effect different words, and indeed not infrequently come to have a meaning the exact opposite of that which was conveyed by their first use.    Even among a people who speak the same language, the same word acquires one meaning in one locality and a different meaning in another.    To save the discussion from becoming too academic, this fact has a bearing upon the meaning at different times given to the quoted phrase.

The words were first inserted in our naturalization laws in 1790.    As the inhabitants of what was then the United States were a more or less homogeneous people who or whose immediate forbears had come

from what has been termed "Northern Europe," and as the vast territories then known as Florida and as Louisiana formed no part of our national domain, and as our people had been in almost continuous conflict with the French and Spaniards, it is doubtful whether the words "white persons," as used in common speech, originally included any of the so-called Latin races. The events of the Revolution, however, and the gratitude which our people felt toward France, and more especially the large number of French Huguenots who had come to make their homes here, caused instant recognition of the French as having a common heritage with us, and the phrase automatically expanded to include them. The desire to be consistent forced us to include the Spaniards and Portuguese, and later the Italian peoples, and broadly the Latin race. The immigration of persons from Southern and Southeastern Europe brought within the meaning of the phrase which we are construing, Hungarians, Poles, Russians, and many divisions of the Slavic race, as at an earlier period it had been recognized to embrace Hebrews, who have always been recognized as a distinct race, or branch of the Semitic, and who have always demanded such recognition, and through their efforts to preserve the purity of their blood have won it. In consequence, the phrase employed in the legislation of 1790 had a broader scope of meaning than it had in Colonial days, and the same phrase in 1875 commanded a still broader meaning.

This is what has been termed the "historical interpretation," a phrase which itself needs to be interpreted. It does not mean that we are to determine whether a particular applicant is a "white person" by inquiring whether people would have so classified him at the time the law was passed, nor does it mean that the lexicographers can change the law. It means that we are to look for the meaning of the act of Congress, aided by the light shed by history, and not by inquiries made of ethnologists. It means further that Congress did not intend to limit the privilege to peoples then commonly recognized as belonging to the white race, or they would, as they to a practical certainty might readily have done, have enumerated them. It means that Congress chose its word for the purpose of describing, so far as could be done, although in very general terms, and therefore vaguely the class, the members of which might enjoy the privilege of citizenship and imposed upon the courts the duty of determining whether the individual applicant belonged to that class. Its further and final meaning, with which we are now concerned, is that the courts may admit to citizenship any person found to belong to the designated class, but no power, except that of Congress, can enlarge that class. The changes which have been made in the naturalization laws gives confirmation to the thought intended to be expressed. The reader of these laws who was an ethnologist and nothing but an ethnologist would get no meaning at all or the wrong meaning out of them. One familiar with the history of our people would know at once that persons commonly known as negroes may be naturalized, and persons known as Chinese cannot be, and would have no difficulty (except in the case of a person of mixed blood) in applying the law in an individual case. With-

out the aid of the light of history, no one could tell what was meant by "African," "persons of African birth," or "of African nativity," but in that light the motive, purpose and meaning of these laws became absolutely clear. The general meaning of "free white person" is just as clear. No difficulty is presented until we descend from the general to the particular. This historical meaning is the same as that given to the act in many of the adjudged cases in which the word "Caucasian" is used. The gain we get from the use of a synonym is more seeming than real. The aid rendered is much like that afforded by a dictionary in which each of two words is defined in terms of the other. All we really learn is that they have the same meaning. "White" and "Caucasian" have the same meaning, or the use of the latter is wrong. Moreover, not only is there room for difference of opinion whether there is any gain in definiteness by substituting "Caucasian" for "white," but the use of the substitute may lead us away from the right meaning. When the long looked for Martian immigrants reach this part of the earth, and in due course "a man from Mars" applies to be naturalized, he may be recognized as white within the meaning of the act of Congress, and admitted to citizenship; but he may not be a Caucasian. Whether in any application the applicant belongs to the class of persons who may become citizens depends upon the decision reached in his case. Such a decision partakes too much of the rescript character to be wholly satisfactory. It seems more like a decision arbitrarily announced than a reasoned conclusion. This is the best, however, of which the nature of the subject permits, and explains whatever different rulings have been made. The means of reaching a general accord, which our appellate jurisdiction affords, will soon produce the desired result.

The present applicant belongs to the race of people commonly known as Hindus. Our view is that Congress, as already stated, has as yet made no provision for his naturalization, and we are without the legal power to naturalize him, as the present laws cannot be extended so as to include him without usurping the lawmaking powers of Congress.

The conclusion reached is, we think, in accord with the weight of authority as disclosed in the adjudged cases, among which are: Camille (C. C.) 6 Fed. 256; Saito (C. C.) 62 Fed. 126; Kumagai (D. C.) 163 Fed. 922; Knight (D. C.) 171 Fed. 299; Najour (C. C.) 174 Fed. 735; Halladajian (C. C.) 174 Fed. 834; Balsara, 180 Fed. 694, 103 C. C. A. 660; Mozumdar (D. C.) 207 Fed. 115; Alverto (D. C.) 198 Fed. 688; Dow (D. C.) 211 Fed. 486; Id. (D. C.) 213 Fed. 355; Id., 226 Fed. 145, 140 C. C. A. 549.

The reargument is refused.