### In re MOHAN SINGH.

(District Court, S. D. California, S. D.  March 24, 1919.)

#### No. 3276.

ALIENS ☞61—NATURALIZATION—"WHITE PERSON"—HINDU.

The possession of a common racial stamp being the basis of classification, the Hindus of India, as members of Aryan branch of the Caucasian race, are "white persons," who, under Rev. St. § 2169 (Comp. St. § 4358), may be naturalized; the meaning to be given the term being that which, from the growth of knowledge, it had when, having accidentally been omitted in revision from the original naturalization law, it was by enactment reincluded.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, White Person.]

Application by Mohan Singh to become a citizen of the United States. Application granted.

S. G. Pandit, of Los Angeles, Cal., for applicant.

Frederick K. Jones, of Los Angeles, Cal., United States Naturalization Examiner.

BLEDSOE, District Judge.  Mohan Singh, a high caste Hindu, competent in all moral and intellectual respects, has applied for citizenship.  His application is resisted by the government upon the ground that, being a Hindu, he does not come within the terms of section 2169 of the Revised Statutes (Comp. St. § 4358).  The matter has been presented in a very able and enlightening manner by the learned counsel for the petitioner (himself a naturalized Hindu), and has been submitted by the government upon the brief filed by it before the United States Circuit Court of Appeals in the Second Circuit in the matter of the application of one Balsara, a Parsee, born in Bombay, India, together with a memorandum submitted to the District Court of Pennsylvania, Eastern District, in the matter of Sadar Bhagwab Singh, also a Hindu, and the decision in favor of the government in the case last mentioned, reported in 246 Fed. 496.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The comprehensive and well-nigh exhaustive brief submitted by the government in the Balsara Case failed, however, to convince the Circuit Court of Appeals of the correctness of the contentions made therein, because the judgment of the Circuit Court (171 Fed. 294) admitting the petitioner to citizenship was affirmed (180 Fed. 694, 103 C. C. A. 660). The whole controversy seems to revolve around the construction to be given to section 2169, supra, which reads as follows:

"The provisions of this title [Naturalization] shall apply to aliens being free white persons, and to aliens of African nativity and to persons of African descent."

The first federal naturalization law was passed March 26, 1790. Section 1 of that act (1 Stat. pp. 103, 104, c. 3) provided "that any alien, being a free white person, who shall have resided," etc., might be admitted to become a citizen, etc. Though the section was amended several times, yet this general language, containing always, however, the phrase "free white persons," remained in the naturalization statute until 1874, at which time, at a revision of the laws, but obviously because of an inadvertence, the phrase was omitted. This inadvertence was due in part, perhaps, to the fact that in 1870 the naturalization laws had been amended, so that the privileges of naturalization were "hereby extended to aliens of African nativity and to persons of African descent." Comp. St. § 4358. Immediately upon the hiatus being discovered, and the suggestion being made that the revision, pronouncedly, was not intended to effectuate a change in the law, but merely a revision of it, section 2169 was amended to read as is first set forth hereinabove.

Much discussion seems to have been indulged in by different courts with respect to the meaning to be accorded now to the phrase "free white persons." The Circuit Court of Appeals of the Fourth Circuit, Dow v. U. S., 226 Fed. 145, 140 C. C. A. 549, inclines to the opinion that since there was a positive repeal, through the revision, of the phrase as originally enacted, and subsequently a re-enactment thereof, its meaning now must be determined by a consideration of the meaning at the time of the last enactment in 1875, rather than at the time of its first enactment in 1790. The truth seems to be, however, that Congress never deliberately repealed the phrase, and that when it was called to its attention that its repeal had been effectuated through a mere inadvertence, its re-enactment or reinstatement was immediately had. In any event the debates in Congress at the time seem to indicate that the action taken in 1875 was taken merely to correct an obvious inadvertence, and therefore, in truth and in fact, it would seem as if the section now should be construed as if the unintentional repeal in 1874 had never occurred.

In the brief in the Balsara Case a great deal of learning is employed in the effort to establish the contention that Congress did not in 1790 intend to include the "white" or "Caucasian" race, as the same has since been called, in its reference to "free white persons." This is probably so, since the classification of races embodying the generic term "Caucasian" had not then been promulgated, at least in America.

Be that as it may, it seems clear to me, however, that the phrase as used in the 1790 statute was intended rather in an exclusive than in an inclusive sense.

Naturalization statutes had been adopted theretofore by several of the American colonies. The committee of three, which reported the original bill containing the phrase "free white persons," was composed of members from the states of Pennsylvania, South Carolina, and Virginia, each of which had naturalization statutes.[1] The latest South Carolina statute, enacted in 1786, provided for the naturalization of "all free white persons,"[2] and from this I think it reasonably safe to assume that the member from South Carolina, Mr. Tucker, probably had something to do with the drafting of the statute reported, and, being familiar with the existing provision of his own state, drew upon that for the language wherewith to indicate the class of persons to whom federal naturalization was to be available.

In South Carolina, at that time, there were black slaves in large numbers, and perhaps, also, even at that late date, red slaves[3] and white slaves.[4] It seems, therefore, obvious that the South Carolina Legislature was declining to accept into the citizenry of the colony slaves and indented servants of every character and color along with those who, in comparison with "reds" and "blacks," then present in large numbers, were to be considered as "whites." There is nothing that I can discover to indicate anywhere that either the colonies originally or the United States government later, when the federal statute was first passed, had in mind the exclusion from citizenship of any other persons than those referred to, to wit, negroes, Indians, and unfree whites. In fact, in the debates on the adoption of the statute in 1790, Representative Page of Virginia, speaking upon the motion, said:

"I think we shall be inconsistent with ourselves if, after boasting of having opened an asylum for the oppressed of all nations," etc. Annals of Congress, cols. 1109–1125.

In spite of the discussions and not infrequent controversies in the courts, which have arisen with respect to the meaning of the phrase, Congress has seen fit at no time since its incorporation into the law to change it, and it remains to-day as it was originally enacted more than a century and a quarter ago. With the march of time and growth of knowledge, ethnologically and otherwise, however, it may be inferred, I think, that Congress, in its successive re-enactments of the language, has re-enacted it with its enlarged meaning in mind; and the conclusion of the Circuit Court of Appeals of the Second Circuit in the Balsara Case, "supported by the great weight of authority," to the

[1] Annals of Cong. vol. 1.

[2] 4 St. at Large, S. C. p. 746.

[3] As late as 1708 one-quarter of the whole body of slaves were Indians. Doyle, English Colonies in America, vol. 1, p. 359.

[4] White slaves were found in all the southern colonies in early days, recruited from English prisons, unsuccessful revolutionists, and kidnapped men, women, and children. Doyle, supra, pp. 382–385. Their presence in the states as late as 1789 was a subject of debate in the Congress of that year. Harper's Encyclopædia of U. S. History, vol. 8, p. 209.

effect that "Congress intended by the words 'free white persons,' to confer the privilege of naturalization upon members of the white or Caucasian race only," seems reasonable and just. The court then continues:

"The words refer to race, and include all persons of the white race, as distinguished from the black, red, yellow, or brown races, which differ in so many respects from it. Whether there is any pure white race, and what peoples belong to it, may involve nice discriminations; but for practical purposes there is no difficulty in saying that the Chinese, Japanese, Malays, and American Indians do not belong to the white race."

Modern ethnologists use the terms "white" and "Caucasian" synonymously and interchangeably. Seemingly the preponderance of respectable opinion includes the Hindus of India as members of the Aryan branch or stock of the so-called Caucasian or white race. See Report of the Immigration Commission, Senate Document No. 662, 61st Congress, Third Session. I have been cited to no anthropological authorities which include the Hindus in any of the other races of mankind. They belong to the Aryan stock, and therefore to the Caucasian or white race, because of certain physical and other peculiarities possessed by them and which indubitably mark their descent. "Caucasians" are "white," whether they live under the tropic sun, and therefore have a very dark skin, or abide in northern climes, and possess a light one. The possession of a "common racial stamp" is the basis of classification.[5]

My conclusion is that, in the absence of any more definite expression by Congress, which is the body possessing the power to determine who may lawfully apply for naturalization, any members of the white or Caucasian race, possessing the proper qualifications in every other respect, are entitled to admission under the general wording of the statute respecting "all free white persons." In the absence of an authoritative declaration or requirement to that effect, it would seem a travesty on justice that a refined and enlightened high caste Hindu should be denied admission on the ground that his skin is dark, and therefore he is not a "white person," and at the same time a Hottentot should be admitted merely because he is "of African nativity." The same observation might apply with respect to equally enlightened members of other races who are now denied admission on the ground that they fall without the designation white or Caucasian. See Balsara Case, supra. But that is a matter for adjustment by Congress, and not by the courts.[6]

[5] Man, Past and Present, Dr. A. H. Kean, Cambridge University Press, 1900, p. 448.

[6] 28 Am. Law Review, p. 818, contains a very interesting article written by Prof. J. H. Wigmore, in 1894, in criticism of Judge Colt's decision (In re Saito [C. C.] reported in 62 Fed. 126), denying citizenship to Japanese on the ground that they are not Caucasians. To maintain his thesis that they are, Prof. Wigmore indulged in the postulate that "Caucasian" and "Aryan" are interchangeable terms, and that otherwise the Semitic peoples, who are freely admitted, would fall under the ban because, being non-Aryan, they would be non-Caucasian. The error in this seems obvious. See Immigration Commission Report, supra, p. 5.

The case cited in 246 Fed. 496, supra, does not seem to be supported, in my judgment, by the controlling authorities, and its reasoning is to me inconclusive. On the contrary, the Circuit Court of Appeals of the Second Circuit, in the Balsara Case, supra, the Circuit Court of Appeals of the Fourth Circuit, in the Dow Case, supra, and other courts cited and relied upon in those decisions, seem to support the views announced herein. In addition, I am advised by counsel for petitioner herein, and his statement is not challenged by the government, that Hindus have been admitted to citizenship in the Southern district of Georgia, the Southern district of New York, the Northern district of California, and the Eastern district of Washington by the courts of the United States, and by the superior court of California in both San Francisco and Los Angeles. All of these precedents are persuasive.

Taken in connection with the reason of the thing, as it appeals to me, the granting of petitioner's application seems proper; and it will be so ordered.